[L. A. No. 9868. In Bank.—July 29, 1927.]

FRANK I. TOBIAS, as Special Administrator of the Estate of WILLIAM E. TOBIAS, Deceased, Appellant, v. FRANCIS D. ADAMS et al., Respondents.

[1] DEBTOR AND CREDITOR—HUSBAND AND WIFE—TRANSFER TO DEFRAUD—EVIDENCE.—If a man keeps his bank account in the name of another admittedly to prevent his creditor from reaching it by legal process and puts his entire estate either in the name of his wife or deposits it in the name of his secretary, knowing that judgments against him are in existence, his mere *ipse dixit* that it is not to defraud his creditor will not create a *bona fide* conflict in the testimony.

[2] ID.—APPEAL—FINDING—CONFLICT IN EVIDENCE.—While a finding will not be disturbed on appeal if there is a substantial conflict in the evidence from which it springs, the evidence, in order to raise a conflict, must be such as to present a fair and reasonable ground for a difference of opinion.

[3] ID.—TRANSFER OF PROPERTY BY HUSBAND TO WIFE—RETENTION OF SOME PROPERTY BY HUSBAND—FRAUD.—Even though the husband in such a case kept certain of his property in his own name, this would not necessarily have prevented the transaction in question from being fraudulent as to his creditors; nor is it necessary to prove guilty knowledge in the wife where she admits she gave no consideration for the transfers, which were purely attempted gifts to her.

[4] ID. — INSOLVENCY OF HUSBAND — FRAUD — INTENT.—Where the husband against whom judgments exist has no other property than that conveyed by him to his wife without consideration, the conveyance is fraudulent and the grantor's intent is immaterial.

[5] ID.—PRIVILEGED COMMUNICATION—EVIDENCE.—In an action by the administrator of the estate of a judgment creditor to set

---

2. See 2 Cal. Jur. 921; 2 R. C. L. 194.

4. Husband and wife, transfers from one to the other as fraudulent, notes, 19 Am. St. Rep. 657; 20 Am. St. Rep. 715; 90 Am. St. Rep. 497. See, also, 12 Cal. Jur. 1017, 1070. Voluntary transfers, when are fraudulent as to creditors, notes, 14 Am. Dec. 703; 28 Am. Rep. 221; 4 L. R. A. 353. See, also, 12 R. C. L. 592. Presumption that fraudulent transfers are in fraud of creditors, note, 119 Am. St. Rep. 556. See, also, 12 Cal. Jur. 1071; 12 R. C. L. 593, 596.

aside certain conveyances made by a husband to his wife and to have certain property standing in the name of the wife declared to be the property of the husband, on the ground that it was taken and held by the wife as a voluntary transaction at the instance of the husband in order to hinder, delay, and defraud plaintiff's intestate as a judgment creditor of the husband, in which action the defendants husband and wife set up in their answer a written contract by which the husband had relinquished certain property to the wife, the pleading of the instrument and introducing evidence upon it by the defendants put in issue the *bona fides* of the paper and waived any privilege thrown around it by the law as a privileged communication between husband and wife, and it was error to exclude evidence by question and answer of the husband and wife relating specifically to the matters covered by the agreement.

[6] ID.—INSOLVENCY OF HUSBAND—EXAMINATION OF DEFENDANTS.— In such a case it was error to exclude evidence as to whether the husband was insolvent at the time he gave the instrument to his wife.

---

(1) 4 **C. J.**, p. 886, n. 52.    (3) 27 **C. J.**, p. 509, n. 3, p. 566, n. 15. (4) 27 **C. J.**, p. 567, n. 20, p. 783, n. 46.    (5) 40 **Cyc.**, p. 2355, n. 27, p. 2397, n. 60.    (6) 27 **C. J.**, p. 567, n. 25, p. 812, n. 95.

MOTION to dismiss an appeal from a judgment of the Superior Court of Los Angeles County. Charles S. Burnell, Judge. Motion denied.

The facts are stated in the opinion of the court.

Norcop & Cushing, Maurice R. Norcop and John J. Cushing for Appellant.

Francis D. Adams and Earl Curtis Peck for Respondents.

PRESTON, J.—Some preliminary considerations must be met before we consider the merits of this appeal. The action is by plaintiff and appellant as special administrator of the estate of William E. Tobias, deceased, against Francis D. Adams and Gertrude B. Adams, as husband and wife, defendants and respondents, to set aside certain conveyances of real property made by said husband to his wife and to have certain property standing in the name of the wife declared the property of the husband on the ground that

it was taken and held by the wife as a voluntary transaction at the instance of the husband in order to hinder, delay, and defraud plaintiff's intestate as the judgment creditor of said husband. The husband is an attorney at law and appeared herein as one of his own attorneys as well as one of the attorneys for his wife.

Appellant has three judgments, all bearing date prior to March 4, 1924, against said husband, on an indebtedness which arose in October, 1923, aggregating some $7,000. He has caused several executions to issue upon said judgments and the same have been delivered to the sheriff of the county for levy upon the property of said defendant Francis D. Adams, attorney at law, with a return in each case *nulla bona*.

It seems, however, that in December, 1925, and during the early months of the year 1926, the husband had a stroke of good fortune. He got together as an attorney's fee some seventy-odd thousand dollars, one-half of which belonged to him and was received by him in liquid assets. The receipt of so large a sum had such an unusual effect upon him that he says he was restless under the weight of it and could not sleep until the securities by which it was evidenced were deposited with the Bank of America at Los Angeles for safekeeping, it apparently never occurring to him that he might lessen his responsibility and increase his nightly repose by paying the representative of his deceased judgment creditor the claims in suit, the justice of which he has never at any time heretofore or now disputed.

In due time, however, to wit, on January 5, 1926, Nicholas William Brick and Helen Brick, his wife, deeded to defendant Gertrude B. Adams a valuable piece of real property for which the sum of $25,000 was paid as follows: $17,000 in cash and the remainder by the assumption of an existing mortgage upon said property in amount of $8,000. This transfer is directly involved in this action, plaintiff claiming the property is community property of defendants and, indeed, it is admitted that the cash payment was advanced through defendant husband from said above-mentioned attorney's fee. It is also admitted that a portion of the remainder of said fee was used in paying creditors of said husband other than plaintiff, and the large surplus remain-

ing was safely placed in the name of the law secretary or stenographer of said husband according to a custom which sprang up suddenly at the time plaintiff began in the years 1923 and 1924 to sue out attachments and levy upon his bank account. It is even said that during the existence of plaintiff's claims some $27,000 appeared at one time in the name of said secretary. But said husband claims at this time that it was not put in her name for the purpose of hindering, delaying, or defrauding creditors but because it was more convenient to have it in that form.

In this connection it is pertinent to quote some of said defendant husband's testimony, where after stating that no real property had stood in his name since the year 1923, he said: "Q. Since that time you have had no property in your name? A. I have had no real property in my name. Q. Do you keep your bank account in your name? A. I have kept a bank account in my name up until some time when you began to attach it every day; then I took it out of my name. Q. When was the last time you had a bank account in your name? A. The last time you attached it. Q. How long ago was that? A. Oh, I think that was some time in '23 or '4; I am not sure which. Q. In whose name did you carry your bank account at the present time? A. I carry my bank account in the name of Edna Smith, my secretary. Q. And all of the fees and money you collect, you deposit in the name of your secretary? A. Well, not all of them; practically all of them, yes, sir.

It should be stated also that said defendant testified that from his law practice in the year 1925 he had an income of $56,243.66; also from the same source for the first six months of 1926, he had an income of $15,000, but the sheriff, after searching with great diligence, was unable to find a penny to satisfy these several and *alias* executions. It should also be noted that defendant Gertrude B. Adams had standing in her name several other very valuable pieces of real property acquired by her from her husband after the indebtedness to plaintiff was incurred. It is also true that the family have two automobiles, which were acquired also by said husband but which are now claimed as the separate property of the wife, although the husband says he may and still does use them as and when he pleases.

Finally, on September 17, 1926, only a few weeks prior to the trial of this action, said defendants entered into a written agreement, whereby said husband relinquished to his wife all the community interests in the above mentioned and three other pieces of real property of the community; also all the household furniture and furnishings of their dwelling and the two above-mentioned automobiles. What the defendant husband received in return for this concession of his rights in property worth, he says, more than $100,000 does not appear, except that it was agreed that property, if any, acquired thereafter should be his own, even though it stood in the name of his said wife, and to her he accorded a corresponding right. It will be noted that this written agreement between husband and wife was made an exhibit to the joint answer of defendants; was filed for record in the office of the county recorder, and was by defendants introduced and received in evidence on the trial of this cause.

The defendants had findings and judgment in their favor in the court below. The case is before us now after passing over the road of trial and appellate procedure with unusual celerity. Refusing to check its speed to a final determination, we are considering it out of order and at the expense of other causes, although it is but fair to state that respondents are "riding to a fall." The case was at issue on December 8, 1926; was tried on December 20, 1926, and judgment for defendants ordered the same day. Notice of appeal was filed in due course, and at the May calendar in Los Angeles a motion to dismiss the appeal was made and denied. At the July calendar in San Francisco respondents noticed a motion styled a motion to dismiss appeal and for affirmance of the judgment on the ground that a casual inspection of the record would disclose that said appeal was frivolous and not taken in good faith.

We were not impressed with this showing until respondent Francis D. Adams, attorney at law as aforesaid, appeared in his own behalf and in behalf of his said wife and represented that the respondents were losing thousands of dollars by this litigation; that appellant had filed a *lis pendens* against "our property" and was harassing and annoying them; that this was one of several suits brought by the same plaintiff and that, after filing them,

plaintiff would make no effort to bring them to trial; that the conduct of plaintiff's attorney in the premises was an "outrage" and said defendant intended to take the matter up with the bar association. Yielding to the *prima facie* force of these statements, we agreed to entertain the motion in accord with the doctrine announced in *Hibernia Sav. & Loan Soc.* v. *Doran,* 161 Cal. 118, 120 [118 Pac. 526], where it was said: "It is a rule of convenience for the expedition of the business of this court that it will not ordinarily entertain a motion to dismiss involving an examination of the record in advance of the hearing upon the merits. But where, as in this case, a mere inspection of the record discloses that no relief can be given to the appellant this court will consider the question, to save unnecessary delay and expense to litigants."

Although this motion is styled a motion to dismiss appeal and affirm judgment it is tantamount to a motion to advance the cause on the calendar and hear it on its merits with the record in such condition as it is then found to be. In *Randall* v. *Duff,* 105 Cal. 271, 272, 273 [38 Pac. 739], speaking of a motion similar to the one before us, the court said: "This is in substance only a motion to advance the cause for hearing prior to being reached in its order upon the calendar; and it can be readily seen that, if such procedure is permitted, the number of respondents who will urge an early hearing of their causes on account of the lack of merit in the appeal will be increased to such a degree as to practically dispense with the regular calendars of causes."

In *Chino Land etc. Co.* v. *Hamaker,* 171 Cal. 689, 690 [154 Pac. 850], it is said: "This motion is made long before the appeals are reached in regular order for hearing in this court, the real purpose of the motion being, of course, to advance the hearing of the appeals in this court, over many other appeals preceding them on our calendar, when there is in fact no good reason for such advancement. It is apparent that this is not a proper case for such action as is desired. Mere consideration of the motion necessarily involves a full examination of the record and briefs of counsel as to the merits of the appeal, precisely the same examination we would be compelled to make upon the hearing of the appeals on their merits when the cases are

regularly reached for hearing.'' (See, also, 2 Cal. Jur., sec. 436, p. 749; Idem, sec. 577, p. 979.)

Being thus required to examine the record we have done so, although we have not had cited to us by either side a single authority on the questions involved.

Appellant urges as his sole ground on the merits that the evidence shows, without substantial or any conflict, that the transaction in suit and particularly the deed of January 5, 1926, from Brick and wife to respondent Gertrude B. Adams, and the written agreement of September 17, 1926, were purely voluntary as to her, without consideration moving from her, and with the intent of said defendant Francis D. Adams to hinder, delay, and defraud plaintiff as judgment creditor.

[1] We are much inclined to agree with appellant. For if a man keeps his bank account in the name of another admittedly to prevent his creditor from reaching it by legal process and then takes his entire estate and either puts it in his wife's name or deposits it in the name of his secretary, knowing that the judgments are in existence, his mere *ipse dixit* that it is not to defraud his creditor would hardly create a *bona fide* conflict in the testimony. [2] ''While a finding will not be disturbed on appeal if there is a substantial conflict in the evidence from which it springs, 'the evidence, in order to raise a conflict, must be such as to present a fair and reasonable ground for a difference of opinion' (*Field* v. *Shorb*, 99 Cal. 661 [34 Pac. 504]; *Felsenthal* v. *Warring*, 40 Cal. App. 119 [180 Pac. 67]).'' (*White* v. *Greenwood*, 52 Cal. App. 737, 742 [199 Pac. 1095, 1098].)

[3] Even if said defendant had kept certain of his property in his own name, it would not necessarily have prevented the transaction in question from being fraudulent. (*Benson* v. *Harriman*, 55 Cal. App. 483 [204 Pac. 255]; *First Nat. Bank* v. *Maxwell*, 123 Cal. 360 [69 Am. St. Rep. 64, 55 Pac. 980].)

Neither is it necessary to prove guilty knowledge in the wife inasmuch as admittedly she gave no consideration for the transfers, which were purely attempted gifts to her. (*Chalmers* v. *Sheehy*, 132 Cal. 459 [84 Am. St. Rep. 62, 64 Pac. 709]; *Judson* v. *Lyford*, 84 Cal. 505 [24 Pac. 286]; *Knox* v. *Blanckenburg*, 28 Cal. App. 298 [152 Pac. 59].)

[4] Defendant Francis D. Adams took the stand and was careful not to state that he had any property on September 17, 1926, other than that relinquished to his wife by said written agreement. If this be true, then as. a matter of law the conveyances, if they be deemed to have occurred on that date, were fraudulent. (Sec. 3442, Civ. Code.) The intent of the grantor in such case is immaterial. (*Atkinson* v. *Western etc. Syndicate*, 170 Cal. 506 [150 Pac. 360].) If a transaction of this kind were upheld by the courts, then fraud uncurbed and brazen would stalk over all the land. We need not, however, pass definitely upon this question, for the motion must be denied because of failure of the court below to allow and consider material evidence in the case. This action by the court may be illustrated by setting out proceedings upon two occasions during the trial.

The defendant Gertrude B. Adams was called as a witness by plaintiff under section 2055 of the Code of Civil Procedure and testified in part: "Q. By Mr. Monteleone: When did you acquire that property, Mrs, Adams? A. Last December. Q. How much did you pay for the property? A. Well, do you mean how much it is worth, how much is the value? Q. No, how much did you actually pay for that property? A. $17,000. Q. Is there any mortgage against the property at the present time? A. Yes. Q. Was there a mortgage against the property at the time you acquired it? A. Yes. Q. How much of a mortgage. A. $7,000. Q. You paid $17,000 cash? A. Yes. Q. Now, where did you get the money to buy that property? Mr. Peck: Just a minute, if your Honor please. Object to that on the ground it is a privileged communication. If she got it from her husband it is certainly a communication between husband and wife, about which I believe she cannot testify. The Court: Well, I cannot assume that she is going to testify that she got it from her husband. She may have got it from the estate of some relative. You may answer. A. I got it from my husband. Mr. Peck: Now, we move to strike out the answer, if the court please, as a privileged communication. The Court: The answer will be stricken out as a privileged communication, a transaction between husband and wife under the section. Q. By Mr. Monteleone: How long did you have the $17,000 to apply on

that property before you purchased the same? Mr. Peck: We object to that as immaterial, if your Honor please. The Court: What is the materiality of that? Mr. Monteleone: I intend to show, if the court please, that the money was acquired by this witness a short time before the property was acquired. The Court: Oh, I don't think that is material, whether she had it one minute before it was acquired or not; I don't think the length of time she had it is material. Sustained. Q. By Mr. Monteleone: Did you acquire the $17,000 from inheritance? A. No. ˙Mr. Adams: Object to that; already asked and answered. The Court: Overruled. Mr. Adams: No, that was stricken out. Pardon me. Withdraw the objection. Q. By Mr. Monteleone: What was your answer? A. No. Q. Did you acquire it from any of your relatives? A. Yes. Q. Did you acquire it from any of your relatives outside of your husband? A. No. Mr. Peck: Now, if your Honor please, we move that the last two questions and answers be stricken out on the ground it is clearly a privileged communication. The Court: Yes, the answers will be stricken out. That is an adroit, but indirect way of adducing testimony from this witness of the fact that the transaction was between herself and her husband. I suppose you can get at that by elimination as well as any other way, but I think the purpose of the law is to keep such transactions out altogether on the ground that transactions between husband and wife are privileged and are not admissible under the section, that is, where the act is between husband and wife, so the motion to strike out will be granted.''

The defendant Francis D. Adams was later called as a witness by plaintiff under said section 2055 of the Code of Civil Procedure, and testified in part: ''Q. Do you operate any automobiles? A. I do. Q. How many? A. Two. Q. In whose names do the automobiles stand? A. Gertrude B. Adams. Q. Do you know where Gertrude B. Adams got the money to buy the automobiles? A. I do. Q. Where, from whom? A. Why, she got it from me; that is, indirectly. One of them she got from me some time, I don't know, five years ago, and that car was eventually traded for a Cleveland car which she now has, and she purchased herself a Paige car, which she now has. Q. You are operating the two cars? A. I operate either one of

them when I please. Q. And you furnished the money to buy both of the cars? A. In the first instance, yes. Q. Do you know anything about this property designated as lot 17 in Tract 6388? A. I do. Q. Do you know when that property was acquired? A. I do. Q. When? A. That property was acquired on or about the 17th of December. That is, the transaction was arranged about the 17th of December and continued thru until sometime in January or February of 1926. Q. Do you know how much was paid for that property? A. $17,000 cash and an $8,000 mortgage assumed. Q. Do you know where the $17,000 came from? A. I do. Q. To pay for that property? A. I do. Q. From whom? A. Me. On or about— Q. Do you know anything about the property— A. I want to explain that answer, tho. The Court: You may do so. A. On or about the 17th day of December I borrowed $5,000 from the Bank of America, and I gave Mrs. Adams a present then, it being just before Christmas, of $1,000 of that $5,000 which I had borrowed. A few days later I received a fee of some $35,000 or $38,000, which was paid to me in gold bonds, payable to bearer, and I gave Mrs. Adams, of that $35,000 then received, $16,000, and a further sum of $4,000 which I gave her in cash as a Christmas present. I had then left—together with my other moneys, I had then left in my possession and in the bank and under my control and in my name approximately $25,000 to $30,000. Q. By Mr. Monteleone: When did you give the $16,000 to your wife? A. I gave the $16,000 to Mrs. Adams between the 20th, or about the 20th, 22nd, it might be, I forget just the day, of December, and the first of February of 1926. That is, the 22d of December, 1925, to the first of February, 1926. The first $1,000 as I stated, I gave to her from a loan made to me by the Bank of America, of which I gave her $1,000 on the 17th of December, and then I gave her an additional $7,000 a few days later, and then I gave her $9,000 a few days later, and then I gave her $3,000 or $4,000 in cash a few days—along in there; I don't know just how I gave her that last $4,000. Q. How was the first money evidenced that you gave to her? Was that given by check or otherwise? A. I gave that to her— Mr. Peck: Now, wait a minute. I think, if your honor please, this comes clearly within the privileged communications, and I

move that the answer be stricken out, all that testimony
as to what he gave her and what he did about it. The
Court: The motion will be granted. It calls absolutely for
transactions with Mrs. Adams. Mr. Monteleone: May it
please the court, the witness had volunteered the statement
himself. The Court: He has not had his wife's consent
yet to testify against her, and the section reads, as I re-
member, that neither party can testify against the other
without the other's consent, and she has not consented, so
the motion will be granted. All that testimony as to the
gifts of money, transfers of money from Mr. to Mrs. Adams
will be stricken out. He cannot volunteer that testimony
without his wife's consent."

[5] It is manifest that the testimony here excluded was
pertinent to the issue tendered by the defendants in their
answer setting up said written agreement of September 17,
1926, which was exhibit "A" thereto. Every question and
answer related specifically to such matter covered by said
agreement. It must be held that defendants as husband
and wife by filing for record a written agreement between
themselves and by pleading it in defense to plaintiff's ac-
tion and by introducing it in evidence put the *bona fides*
of such paper in issue and thereby waived expressly any
privilege thrown around them by the law. It would be
monstrous if husband and wife might between themselves
conspire to defraud the creditors of the one or the other
and to conceal their act produce a written instrument which
is immune from all inquiries and which must be accepted
by the defrauded party as final. The freedom of contract
between husband and wife and the power to transmute
community property into separate property or *vice versa*
by agreement between themselves renders it imperative that
when such an agreement is relied upon by their joint an-
swer, thereby the whole subject matter of said agreement
is open to inquiry which may include communications from
one to the other. This we understand upon examination of
the transcript to be the effect of the holding in *Johnston*
v. *St. Sure,* 50 Cal. App. 735 [195 Pac. 947], rehearing
denied by this court.

There as here a defendant husband alleged that the prop-
erty in question was the separate property of his wife.
Nothing, therefore, that she could say when under examina-

tion as a witness could in anywise affect or injure her husband if the allegations of their joint answer were true. Moreover, the witness refused to answer questions practically the same as those stricken out in the case before us. The court held that the witness should answer the questions and that by the allegations of the answer husband and wife had waived all privilege in connection with the said transaction.

Besides, the communications stricken out in this case were not such communications as are privileged, anyway. (*Poulson* v. *Stanley*, 122 Cal. 655, 658 [68 Am. St. Rep. 73, 55 Pac. 605]; *Savings Union Bank etc. Co.* v. *Crowley*, 176 Cal. 543, 547 [169 Pac. 67].)

[6] The court also was in error in excluding the answer to the question as to whether the defendant Francis D. Adams was then insolvent. This was December 20, 1926. The contract between husband and wife was dated September 17, 1926, a date only about three months prior thereto. If he was insolvent on September 17, 1926, the transaction was a fraud as a matter of law. (Sec. 3442, Civ. Code; *Atkinson* v. *Western etc. Syndicate, supra.*) Plaintiff should have been allowed to start with said defendant's condition on the trial and, if insolvent then, to trace it back at least to September 17th, which was not a remote date.

This record presents a clear case of an attorney at law evading his just obligations by trying to take advantage of his knowledge of the infirmities of the law and then trying to have this court peremptorily sustain him in his conduct. The lawyer, above all others, should redeem his personal obligations, if for no other reason than to prevent reflection upon the profession.

The appeal instead of being frivolous and taken in bad faith appears on the contrary to have been taken in good faith and to be meritorious.

Motion denied.

Curtis, J., Langdon, J., and Shenk, J., concurred.

Seawell, J., and Waste, C. J., concurred in the order denying the motion.