[Civ. No. 5807. Second Appellate District, Division One.—May 9, 1928.]

DEMPSEY–KEARNS THEATRICAL AND MOTION PICTURE ENTERPRISES, INC., Appellant, v. ALEXANDER PANTAGES, Respondent.

Mott & Vallee and Kenneth E. Grant for Appellant.

W. I. Gilbert for Respondent.

HAHN, J., *pro tem.*—Plaintiff prosecutes this appeal from a judgment rendered in favor of the defendant in an action seeking to recover $2,356.76, claimed due and owing from defendant, arising out of a contract entered into between the parties. The evidence was presented to the court either by stipulation or by testimony which was not disputed.

In October, 1921, a written contract was entered into wherein the defendant herein was the party of the first part and designated as "manager"; the plaintiff herein was the party of the second part and designated as "producer," and Jack Dempsey and Jack Kearns were the parties of the third part and designated as "artists." The contract in question is an extended one, and we will quote only such paragraphs as we deem material for our consideration. They will be referred as numbered in the written agreement.

"First. The Manager agrees to engage and employ, and the Producer engages to furnish and secure the services of the said Artists during the period of this contract.

"The Producer agrees that said Artists will render their exclusive services to the Manager, as herein provided, during the term of this agreement.

"Second. The said Manager agrees to organize, assemble and put together the vaudeville show around Jack Dempsey as champion heavyweight pugilist of the world, in which show the said Dempsey and Kearns shall render their services as herein provided.

"Fourth. The said Manager guarantees to the said Producer twenty (20) weeks' employment, and the term of this contract shall be for twenty (20) or more weeks.

"Fifth. . . . Whenever a week is lost by travel, as hereinbefore provided, the Producer shall receive no pay for said week, nor shall the said week be considered as one of the weeks of the term of this contract or of the guarantee of employment given to the said Producer.

"Sixth. The Artists shall not be required to appear in more than three (3) shows a day, except on Saturdays and Sundays, when four (4) shows may be given.

"Seventh. Out of the gross receipts at the box office of the theatre or theatres in which the Artists appear, there shall first be paid to the Producer by the Manager the sum of four thousand dollars ($4,000) per week, after which there shall be paid from such receipts the cost of the show in which said Artists are appearing, said cost to include transportation, salaries of artists and expenses of an advance man, but the aggregate cost of said show, aside and apart from the four thousand dollars ($4,000) paid to the Producer as therein provided, shall not in any event exceed the sum of twenty-three hundred and seventy-five dollars ($2375).

"After the aforesaid payment of four thousand dollars ($4,000) shall have been made to the Producer and the cost of the show, as provided in the preceding paragraph, then there shall be paid to the manager the sum of four thousand dollars ($4,000) or as much thereof as the gross receipts will permit. Thereafter any surplus remaining, after the payment of the war tax, shall be divided fifty per cent (50%) to the Producer and fifty per cent (50%) to the Manager.

"The payment of the four thousand dollars ($4,000) to the Producer shall be as follows:

"Two thousand dollars ($2,000) in American currency and two thousand dollars ($2,000) in Canadian currency in the cities of Winnipeg and Vancouver;

"The payment of the Producer in all other Canadian cities shall be in American currency;

"Any moneys due to the Producer under the splitting arrangement shall be paid in Canadian currency;

"Otherwise, all other payments shall be in American currency.

"Ninth. The Manager guarantees to the Producer that the minimum receipts of the Producer for each week that the services may be rendered by the Artists as herein provided shall be not less than the sum of four thousand dollars ($4,000)."

Attached to and made a part of the contract is what is termed therein as a "printed form of contract." This printed form contains extended provisions specifying the authority of respondent "as manager" to determine the place, time, and manner of giving the vaudeville shows and also establishes with considerable detail the duties and obligations of the players who are therein designated as "artists." The form contract makes use of the terms "salaries" and "employment," as, also, other terms commonly used in declaring the relation of employer and employee.

The controversy here involved arose out of the fact that the box office receipts for a Sunday night performance given in Kansas City were stolen from respondent's safe in the office of the theater, where the money had been placed by respondent's agent for safekeeping. It was stipulated in open court that the loss of the money was in nowise due to any negligence or carelessness on the part of respondent or his agent.

Subsequent to the theft respondent refused to make settlement with appellant on the basis of the box office receipts taken in at the Sunday night performance, contending that this money was partnership funds, and that, inasmuch as the loss was not due to any negligence on his part, he was not accountable to appellant for any of the proceeds from that performance. It seems to have been conceded by respondent at the trial that had the money not been stolen, plaintiff would have been entitled to payment, by reason of the Sunday night performance at Kansas City, in substantially the amount set forth in the complaint.

The case was tried by both sides upon the theory that the determination of any liability on the part of the respondent to the plaintiff would depend upon whether or not the contract in question constituted a copartnership. Plaintiff contended vigorously that there was no copartnership, but rather an agreement between independent parties. Defend-

ant resisted plaintiff's claim on the ground that the contract did constitute a copartnership. Briefs filed by both parties on the appeal are largely occupied with a discussion of the question as to whether or not there was a copartnership.

It appears from the contract and the evidence presented at the trial, that appellant had no part in fixing the price of admission to be charged for the shows, nor any authority in employing the help or players, or in fixing their compensation. The box office receipts were in the possession and charge of respondent's agents and were by them deposited in the separate accounts of the respondent carried in the name of the different theaters. Respondent and his agents alone had the right to check on these funds, and all payments were made during the life of the contract to appellant by checks drawn upon respondent's bank accounts and signed by him or his agents.

Looking to the provisions of the contract for the distribution of the funds derived from the shows, it appears that the first $4,000 was paid to appellant, and, if the box office receipts in any week did not amount to $4,000, respondent was obligated to make up the deficit out of his own pocket. After the first payment of $4,000 to respondent, the salaries of the artists and traveling expenses were to be paid not exceeding the sum of $2,375. These salaries and all expenses were a liability assumed by respondent, and, if in any week the gross box receipts did not amount to enough to pay the $4,000 to appellant and the salaries and traveling expenses of the troupe, respondent was legally liable to pay such deficit. Unquestionably, respondent was also liable to the government to see that the admission tax was paid.

In fact, when one carefully examines the contract, which it must be admitted is far from clear in declaring the legal relations between the parties, it appears that appellant had no obligations under the contract other than to furnish or induce Dempsey and Kearns to enter into the contract which at its outset declares that the respondent, as manager, agrees to engage and employ them as artists. Unquestionably, under the contract, Dempsey and Kearns, as individuals, assumed certain obligations toward the respondent, but otherwise the entire burden of carrying out the enterprise so far as the appellant is concerned was assumed by

the respondent. Appellant's share in the profits of the venture was not dependent, except as to certain excess income, upon whether the enterprise was a success or not, nor, on the other hand, could the appellant be held liable under the contract for any portion of the loss that might be incurred in the enterprise.

It is too well settled to require discussion that an essential element in a copartnership is the joint ownership of the property, a proportionate sharing in the profits and a like proportionate sharing in the losses. (*Wheeler* v. *Farmer*, 38 Cal. 203.) The essential element of the copartnership is clearly lacking in the contract.

However, the mere fact that compensation to one or all of the parties is dependent upon the enterprise producing a profit, and that such profit is shared in proportions, does not constitute the arrangement of a copartnership. (*Lyden* v. *Spohn-Patrick Co.*, 155 Cal. 177 [100 Pac. 236]; *Coward* v. *Clanton*, 122 Cal. 451 [55 Pac. 147].)

We are satisfied that the contract in question does not meet the requirements of the provisions of the Civil Code relating to copartnerships so as to constitute it a copartnership.

But, respondent urges, even if his contention of a copartnership cannot be sustained, the contract constitutes a joint enterprise, and upon that theory the money stolen was the joint property of appellant and respondent, and therefore he cannot be held liable to appellant for a share of the funds taken.

The line of demarcation between a "copartnership" and a "joint enterprise" is not clearly drawn, either by statutory enactment or judicial interpretation. The term "joint enterprise" is commonly recognized in judicial discussion as a term used to characterize a single joint venture, while the term "copartnership" is more generally used to characterize a general and continuing joint venture. It is, however, held without dispute that in order to bring a contract within the legal designation of a copartnership or a joint enterprise, it must appear that the parties thereto are associated together with the joint benefit of all; that they are joint owners of the property belonging to the association and share jointly in the profits as well as in the same proportion bear the losses that might result from the enterprise.

It has been held that certain requisites of a copartnership do not pertain to a joint enterprise, but we do not deem a discussion of those differences as necessary to this decision.

As already pointed out in our discussion, the contract does not provide for joint ownership of the box office receipts, nor for a joint division of the profits; nor does it provide anywhere for a joint sharing of the losses. Furthermore, it appears that the box office receipts which respondent claims were the joint property of respondent and appellant were never dealt with by the parties as joint funds. Indeed, the treatment of the box office receipts, particularly by respondent, would justify but one conclusion, and that is that the parties considered this money was the property of respondent and that he was obligated to make certain payments to appellant. We are of the opinion that the funds stolen did not constitute the joint property of respondent and appellant, but, rather, the property of respondent, and that under the admissions made during the trial respondent would be liable to appellant for substantially the sum claimed in its complaint.

The record discloses that during the trial the parties showed a disposition to agree upon the amount which would be payable to the appellant by the respondent, if it was determined that appellant was entitled to recover in this action. Under these circumstances, it would seem unnecessary to have a retrial of the case in view or our conclusion on the legal question that seems determinative of the matter. If, therefore, the parties will file a written stipulation as to the amount of money that appellant would be entitled to under the views as herein expressed, then the lower court is directed to prepare findings of fact in accordance with this opinion, and conclusion of law that plaintiff is entitled to recover the amount from the defendant agreed to in such stipulation, and to enter judgment accordingly; provided that in such findings and judgment, defendant shall be awarded judgment against the plaintiff for the sum of $312.70, being the amount claimed by defendant in his cross-complaint, and for which sum judgment was entered by the court in the judgment appealed from. If, however, such stipulation is not filed within such time as the trial court may determine that will enable the court to make the findings and enter the judgment as here indicated, then a new

trial will be necessary only as to the amount claimed owing by the plaintiff in his complaint from the defendant. The claim of the defendant in his cross-complaint against the plaintiff has been determined and will require no retrial.

That part of the judgment which declares that the plaintiff is entitled to nothing from the defendant on its claim as set forth in its complaint is reversed. The judgment in favor of the defendant on his cross-complaint against the plaintiff is affirmed.

Houser, Acting P. J., and York, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 5, 1928.

All the Justices present concurred.