[Civ. No. 13689. Second Dist., Div. Three. Jan. 25, 1943.]

HERBERT C. ENOS, Respondent, v. PICACHO GOLD MINING COMPANY (a Corporation) et al., Defendants; NIPISSING MINING COMPANY, LTD., (a Corporation), Appellant.

Gibson, Dunn & Crutcher and Henry F. Prince for Appellant.

Zach Lamar Cobb for Respondent.

SHAW, J. pro tem.—The defendant, Nipissing Mining Company, Ltd., appeals from a judgment in favor of the plaintiff.

The plaintiff, who is a mining engineer, was one of the organizers and first directors of Picacho Gold Mining Company, a corporation organized in 1934 in the State of Ohio, which will be hereinafter referred to as the Ohio company. He was appointed its general manager, and rendered sundry services to it, for which there was due to him on January 28, 1935, the sum of $7,850; and on that date a note in his favor for the sum stated, due on or before one year from its date, was executed and delivered to him by the Ohio company. The validity of this note is conceded by appellant. No security was given for the note, and by its terms interest was to be paid only out of the maker's net income—which has not yet made its appearance. Soon after the Ohio company was formed it obtained from one of its promoters an assignment of a contract, referred to in the record as a "bond and lease," by which it could acquire title to a certain gold mining property, on payment of a price, the balance of which appears then to have been $145,900. Thereafter the Ohio company acquired another similar contract for purchase of some adjoining mining property. This property was all in the Picacho Mining District, Imperial County, California, and no mines appear to have been in operation or opened thereon at the time these contracts were acquired. The Ohio company also made a conditional sale contract to purchase a considerable amount of mining machinery. The Ohio company had, as far as appears, no other property and no means of obtaining title to this mining property under these contracts unless it could obtain money from some source. All its stock except five shares was issued in exchange for the assignment above mentioned. It made several attempts, extending over a period of two years or more, to obtain a loan from the Reconstruction Finance Corporation. An application for such a loan was approved, but nothing came of it. The Ohio company borrowed some money from its stockholders with which to make payments on the contracts above mentioned. While this was going on plaintiff, on June 20, 1935, severed his connection, except as stock-

holder, with the Ohio company. Finally, that company made a written agreement with defendant the Nipissing Mining Company, Ltd., a Canadian corporation, hereinafter designated as Nipissing, which has given rise to this lawsuit. This agreement was authorized by the board of directors of the Ohio company on October 29, 1938, and approved by its stockholders on November 16, 1938. Pursuant to this contract, a new corporation, the defendant the Picacho Mining Company, hereinafter referred to as the California company, was organized under the laws of California, the Ohio company transferred to it the above mentioned contracts for purchase of mining property and machinery, Nipissing loaned the California company $200,000, out of this sum the balance due on the contracts for purchase of the mining property, then amounting, less a discount, to $93,666.67, was paid, a conveyance of the mining property was made to the California company, and that company made its note to Nipissing for the loan, and to secure this note executed to Nipissing a mortgage on the mining property. All of these acts after the organization of the California company were handled through an escrow, so that the various transfers and the mortgage all took effect simultaneously in December, 1938.

The plaintiff brought this action against all the corporations above mentioned, as well as some individuals, and by his amended complaint, filed at the trial "to conform to the proof," he sought a judgment against all the defendants on his promissory note, and also, as to Nipissing, a decree that his claim is a charge on the mining property prior to that of Nipissing. The trial court made findings in plaintiff's favor, gave him judgment for the principal of the note against the Ohio company and decreed that the transfer of the mining property by the Ohio company to the California company was void as to plaintiff and that he had a lien on the mining property which was paramount to the mortgage of Nipissing. In support of this judgment plaintiff relies on two propositions. First, he claims that by the contract between the Ohio company and Nipissing the two became joint adventurers in relation to the mining property; and, second, he contends that the Ohio company's transfer of its assets to the California company and the latter's mortgage to Nipissing were made with intent to delay and defraud plaintiff as a creditor of the Ohio company, and were void as to him. Subordinate

to these are other contentions which can be considered in connection with them.

 The contention regarding a joint adventure is based on the terms of the contract between the Ohio company and Nipissing, and to its understanding a further knowledge of the terms of that contract is essential. It is too long to insert here, but its salient provisions—those which must control its interpretation in this respect—may be stated as follows: After referring to the Ohio company's contracts for the purchase of the mining property, on which it recited that not more than $125,000 was then due, and stating that the Ohio company desired Nipissing to advance to it or the new company hereinafter mentioned $200,000 to be secured by a first mortgage on the mining property, the contract provided that Nipissing would incorporate a new corporation, under the laws of California, to which the Ohio company would cause the mining property to be transferred, that Nipissing would advance to this California company $200,000 to be secured by first mortgage executed by the California company on the mining property, that the balance of the price of this property should be paid from the loan, and that pending the completion of that transaction Nipissing would advance to the Ohio company $25,000 or more to finance current mining operations, which was to be repaid out of the loan. The California company was to assume certain debts of the Ohio company—which do not seem to include that to plaintiff. So long as any part of the money secured by the mortgage remained unpaid, Nipissing was to have full control and management of operations on the mining property. Nipissing was to have an option to buy 51 per cent of the stock of the California company (other than six directors' shares), at any time within two months after the loan was paid, for $333,000, on which any amount unpaid on the loan would be credited. The Ohio company was then to receive the other 49 per cent of the stock. In the meantime all the stock except six directors' shares was to be issued to and held by a trustee and not voted. Six directors' shares were to be issued as full paid, three to nominees of the Ohio company and three to nominees of Nipissing. If the option was not exercised Nipissing was to cause the three directors' shares held by its nominees to be transferred to the Ohio company, and the latter was to receive from the trustee all the stock to be held by it. The terms of this contract were substantially carried out, the

California company already referred to being the new corporation organized under it, except that no shares of stock of that corporation have been issued to a trustee, the only shares issued by it being the six directors' shares. The same person who was general manager of Nipissing became also general manager of the California company and acted as such without any compensation from the California company.

We cannot see in this contract, or in the acts of the parties in carrying it out, anything which can properly be deemed a joint adventure. In *Dempsey-Kearns Theatrical & Motion Picture Enterprises* v. *Pantages,* (1928) 91 Cal.App. 677, 682 [267 P. 550], the court gave this definition of a joint adventure: " . . . in order to bring a contract within the legal designation of a copartnership or a joint enterprise, it must appear that the parties thereto are associated together with the joint benefit of all; that they are joint owners of the property belonging to the association and share jointly in the profits as well as in the same proportion bear the losses that might result from the enterprise." This statement was approved and followed in *Quinn* v. *Recreation Park Assn.,* (1935) 3 Cal.2d 725, 728 [46 P.2d 144], and *United Farmers Assn.* v. *Sakiota,* (1935) 7 Cal.App.2d 559, 560 [46 P.2d 770], as well as other cases; and the Sakiota case was cited in *Stoddard* v. *Goldenberg,* (1941) 48 Cal.App.2d 319, 324 [119 P.2d 800], as authority for the proposition that before the relationship of partners or joint adventurers can exist, "it must be shown that there is a community of interest and an agreement to share jointly in the profits and losses resulting from the enterprise." In *Spier* v. *Lang,* (1935) 4 Cal. 2d 711, 716 [53 P.2d 138], it was held that the element of joint participation in the conduct of the business is necessary to constitute the parties joint adventurers.

In the present case, Nipissing, before it exercises its option to buy stock of the California company, is merely a lender of money. It did, indeed, stipulate for certain other matters, such as its right to nominate three directors of the California company and to have control of operations on the property, which might conduce to the safety of its loan; and it required the proceeds of the loan to be applied to purposes which would enhance its security. None of these matters, however, can suffice to convert its loan of money into any other sort of transaction. It appears also that Nipissing had been engaged in the gold mining business for a long time,

that the mines it was operating were nearly exhausted when this contract was made, and that it was looking about for another sphere of operations. Plaintiff lays stress on these facts, and they do show that the motive which induced Nipissing to enter into the transaction was probably the hope that it might by means of its option become the owner of a controlling interest in a new mine and thus continue its operations. But neither does such a motive alter the nature of the transaction. Until the option is exercised Nipissing has no interest by way of ownership in the property, and is not jointly participating in the conduct of the business with a view to obtaining profits therefrom. There is, it is true, a provision in the contract, and also in the mortgage, that until the mortgage is paid off any available profits shall be applied on the mortgage; but this is not an agreement to share in the profits. Money paid to Nipissing under this term of the contract would not come to it as profits, but as payment of interest or principal of its loan.

Since the option has not yet been exercised, the situation to arise upon its exercise is not important here, except as it may throw light on the prior situation. After exercise of the option, Nipissing would be a stockholder in the California company, the Ohio company would be the holder of the other stock therein, except for directors' shares, and the California company would be the operator of the mine. ■ As suggested in *McSherry* v. *Market Corp.*, (1933) 129 Cal.App. 330, 333 [18 P.2d 776], cited by plaintiff, a corporation may be but an instrumentality to carry out a joint adventure, and hence the mere fact that a corporation is interposed as an operating agent between two parties who hold its shares does not prevent them from being joint adventurers. But, on the other hand, that mere fact does not make them joint adventurers. The elements of a joint adventure must be found in other matters. Here they do not so appear.

■ But even if there were a joint adventure, it is not apparent how that fact would impose on Nipissing any liability for plaintiff's note or make its mortgage subject thereto. The note was executed long before the joint adventure, if any, was created, so that plaintiff can claim nothing on the theory of appearances, or estoppel by reason thereof to deny liability. There is nothing in the agreement out of which the joint adventure, if any, must be constructed, to suggest an assumption by either party of previous debts of the other. Cer-

tainly one who enters into a joint adventure with another does not by that fact alone become liable for previous debts of the other, even if they have been incurred in connection with the subject matter of the joint adventure; nor is he thereby disabled from lending money to his fellow adventurer, or taking from him a mortgage to secure such a loan; nor does the mere existence of the joint adventure afford any reason why debts of such a mortgagor, not incurred in connection with the joint adventure, should be placed ahead of the mortgage. Plaintiff points to the fact that after the mining property was paid for and the other advances made by Nipissing were repaid, as required in the agreement, there remained $65,000 of the proceeds of the loan in the treasury of the California company, which was used to improve and develop the mining property, and he insists that this should have been used to pay his note. This point is argued both under the head of joint adventure and that of fraud on plaintiff as a creditor. We cannot see its relevancy to the matter of joint adventure, for it has no tendency either to prove the existence of a joint adventure or, if one did exist, to impose liability on the parties thereto. Its bearing on the question of fraud will be considered later.

Coming now to the question of fraud on plaintiff as a creditor, it is to be noted that in his amended complaint plaintiff alleged only that *the Ohio company* made the various conveyances, assignments and transfers of its property to the California company "with the intent to hinder, delay and defraud plaintiff, as a creditor" of the Ohio company, "intending thereby to put the said property beyond the reach of plaintiff, as its creditor," and that *the California company* accepted them with the knowledge of that fraudulent intent, and with the intent to assist in the fraud. The findings are to the same effect. In neither complaint nor findings is there any statement that Nipissing knew of or in any way aided or participated in this fraudulent intent of the Ohio company and the California company, or that Nipissing itself had any such intent. Appellant contends that there was no evidence to support such a finding, had it been made. Respondent does not dispute this contention and we have noted nothing contrary thereto in the record; we therefore accept it as correct. It does appear, from complaint, findings and evidence that before Nipissing made the loan and received the mortgage, it was informed that plaintiff was a creditor of the

Ohio company. Appellant contends also that the evidence does not support the finding of fraudulent intent on the part of the Ohio company, but we do not pass on this contention because, assuming such intent, it does not, in the circumstances of this case, support the judgment subjecting appellant's mortgage to payment of plaintiff's claim.

██ At the time of the transaction in question it was subject to the provision of section 3439 of the Civil Code, as it stood before the 1939 amendment, that "Every transfer of property or charge thereon made . . . with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor . . . " In the application of this rule it is settled that "A conveyance made for a valuable consideration may not be attacked by the grantor's creditor, even though the transaction was entered into by the debtor with intent to delay or defraud his creditors, unless the grantee so intended or participated in or had knowledge of the fraudulent intent." (*Kuhlman* v. *Pacific States S. & L. Co.*, (1941) 17 Cal.2d 820, 821-822 [112 P.2d 620].) The same rule is applicable to a mortgage or other incumbrance as to a conveyance.

[5] Mere knowledge by Nipissing that plaintiff was a creditor of the Ohio company is not enough to show an intent on its part to defraud him or to charge it with notice of such intent, if any, entertained by the Ohio company (*Kuhlman* v. *Pacific States S. & L. Co.*, *supra*). In this connection plaintiff places considerable emphasis on a provision of the contract between Nipissing and the Ohio company that the latter "shall obtain and deliver such consents or other agreements or take such steps or proceedings as may be necessary to effectively postpone all claims" of its creditors other than trade creditors "so that the title of the new company shall be clear of all claims of such creditors and the transfer . . . to such new company binding upon all such creditors." Nothing was done under this provision regarding plaintiff's claim, and appellant, we assume, is to be charged with notice of this fact. However, nothing was necessary to accomplish the result indicated by the language quoted. As a purely unsecured creditor plaintiff had no lien or claim on the property, and the transfer, if made for a valuable consideration, was binding upon him. He could be placed in a better position only if the transaction was made in fraud of creditors—a proposition which cannot be deduced from the terms of the contract it-

self and which, as we have already stated, is not, so far as knowledge or intent of Nipissing is controlling, either stated in the pleadings or findings or established by the evidence. This contract was drawn by lawyers, and we see in this provision of it no more than a manifestation of that abundance of caution commonly displayed by the legal profession, in an effort to provide against possibilities and contingencies.

 The court found that after the contract between the Ohio company and Nipissing was made and the conveyances and mortgage provided for by it were executed and delivered, the Ohio company withdrew from the State of California, where it had previously been authorized to do business, and undertook to dissolve its corporate existence, and is now "a dormant corporation." We do not understand this to mean that the corporation was actually dissolved, and certainly the evidence does not go that far. As a part of a plan of reorganization the Ohio company undertook to organize a Nevada corporation to which its property was to be transferred. Stock of this Nevada corporation was to be issued to stockholders of the Ohio company and the latter was then to be dissolved. Plaintiff asserts that this plan made no provision for paying him, but this assertion is not accurate, for the plan did provide that the Nevada corporation would assume and pay all liabilities of the Ohio company. However, we do not regard these proceedings of the Ohio company as of any importance here, for two reasons: first, it does not appear that this plan of reorganization was ever carried to completion; and second, it does not appear that Nipissing in any way participated in this plan or was even informed of its existence. Whatever tendency the adoption of this plan by the Ohio company may have to show its intent to defraud plaintiff, certainly it cannot, in the absence of a showing that Nipissing knew of it, tend at all to show such intent on the part of Nipissing. Plaintiff contends that this action of the Ohio company was "done pursuant to the requirements of" Nipissing, the requirements referred to being the provision of the contract above discussed that the Ohio company would take such steps as were necessary to postpone the claims of its creditors to the transfer to the California company. We can see no connection between this term of the contract and the acts now under discussion. As already stated, plaintiff had no lien on the property and no such steps as these were necessary to the carrying out of the contract.

■ Coming again to the failure to apply, in payment of plaintiff's note, the part of the proceeds of the loan which remained in the treasury of the California company, we note that the contract between the Ohio company and Nipissing did not contain any provision regarding the application of this remainder; but perhaps it may be said that Nipissing brought about the use of it already stated by virtue of its nomination of three directors of the California company and the functioning of its general manager as general manager of the California company. There is nothing in all this, however, which shows or tends to show any intent of Nipissing to defraud plaintiff. As lender of money Nipissing had a right to stipulate for the use of the money lent, and it might have gone so far as to insert in the contract a provision that it be used as it was used, without being subject to the imputation of fraud. Application of the money to improvement of the property was beneficial, rather than detrimental, to plaintiff. This money was not concealed, or suddenly removed from plaintiff's reach. If for any reason it was subject to his claim he could have taken effective proceedings to assert that claim against it before it was expended. He was informed of the general nature of the transaction about the time it was entered into, but took no steps to look into it for a long time.

■ Plaintiff contends, however, that the Ohio company, by the transfer of its several contracts to the California company, divested itself of all its property, that it received no consideration for the transfer, and that by reason thereof it became insolvent. If such were the case, the transfer would be fraudulent and void as to plaintiff, an existing creditor, under the provision of section 3442, of the Civil Code, as it existed at the time of the transfer, that "any transfer or incumbrance of property made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency, shall be fraudulent, and void as to existing creditors." In such case, it would not be necessary for plaintiff to show fraudulent intent of the transferee, or its knowledge of any fraudulent intent of the transferor. (*Tobias* v. *Adams*, (1927) 201 Cal. 689, 695 [258 P. 588].) Indeed, where both insolvency or contemplation thereof on the part of the transferor and lack of a valuable consideration for the transfer appear, the transfer is void under section 3442 without any showing of actual intent to defraud by

either party. (*Lefrooth* v. *Prentice*, (1927) 202 Cal. 215, 228-229 [259 P. 947].) ██ The term "voluntarily," as used in section 3442, is synonymous with its companion phrase, "without a valuable consideration," and adds nothing to the section. (*Security Trust Co.* v. *Silverman*, (1930) 210 Cal. 578 [292 P. 636].) ██ We do not agree that the transfer by the Ohio company to the California company was without consideration. By the terms of the agreement for the transfer the California company was to assume and agree to pay the balance due from the Ohio company for purchase of some machinery, amounting to $57,000, certain other debts of the Ohio company amounting to not over $25,000 and all further operating debts it might incur up to the transfer. Such an assumption of liability is a sufficient consideration to uphold a transfer against such an attack as we are now considering. (*Bacciocco* v. *Curtis*, (1938) 12 Cal.2d 109, 114 [82 P.2d 385] ; *Mix* v. *Yoakum*, (1934) 138 Cal.App. 290, 294 [31 P. 2d 1071] ; *Hasenjeager* v. *Voth*, (1928) 91 Cal.App. 394, 398 [267 P. 146] ; 12 Cal.Jur. 1015, 1021.) ██ Furthermore, the agreement provided that the Ohio company was to receive shares of stock of the California company for its transfer. If Nipissing does not exercise its option to buy part of the stock the Ohio company will receive all of it, and thus, in effect, it will own the same property it had before, but greatly improved and freed from conditions of payment formerly attached to it. If Nipissing does exercise its option, the Ohio company will receive only 49 per cent of the stock, but Nipissing must pay the California company $333,000, either all in cash, or partly in cash and partly by cancelling its loan, and this would bring the value of the 49 per cent of the stock received by the Ohio company nearly up to the value that all of it would have if the option were not exercised, on the valuations written into the contract and not disputed here. This is sufficient to comply with former section 3442 of the Civil Code, above quoted. One who transfers property to a corporation and in exchange for it receives all of the stock of the corporation, or even a substantial part of it where the corporation has other substantial assets, has received a valuable consideration for the property, within the meaning of section 3442.

██ Plaintiff calls our attention to the fact that no stock of the California company, except the six directors' shares, has yet been issued, and contends that by reason thereof the Ohio

company has received nothing for the property. Where a contract provides for consideration to a transferor for his transfer of property, the transfer does not become a voluntary one, within the meaning of the rule now under consideration, merely because the consideration is not received immediately or at the time fixed therefor. The contract provided that the stock other than directors' shares should be issued and held by a trustee until it was determined whether Nipissing would exercise its option, and this was not done. But this is a mere incident to the other provisions that the Ohio company shall have all of the stock if the option is not exercised, and 49 per cent if it is exercised. It is true, the stock called for by the contract cannot be issued without a permit from the Commissioner of Corporations and that no permit therefor has yet been issued or applied for. If on application for such a permit he issues it, no doubt he will do so on such terms and conditions as will protect the rights of the Ohio company in the property it has transferred. If he should refuse a permit, or if the contract or this particular part of it should be held to violate the Corporate Securities Act, the Ohio company would not for that reason forfeit all interest in the property. The terms of the contract show that the transfer was not intended to be made without consideration, and if the consideration should fail for any reason, the Ohio company would undoubtedly have rights the exact nature and manner of assertion of which we need not consider, whereby it could maintain or reclaim an interest in the property transferred.

Moreover, the loan of $200,000 by Nipissing and the use made of it cannot be ignored in considering the question of consideration. Had that loan been made directly to the Ohio company and a mortgage made by that company to Nipissing, the money loaned being used as it was here, to pay for and to improve the mortgaged property, no question could have been raised regarding the existence of a valuable consideration for the mortgage, nor would the facts in the case, if otherwise the same as they are, lend any countenance to the theory that the transaction was in fraud of plaintiff or any other unsecured creditor of the mortgagor. The interposition of the California company between the Ohio company and the lender, Nipissing, does not alter the essential nature of the transaction in this respect, nor afford a basis for the charge of fraud.

Plaintiff also cites *Blanc* v. *Paymaster Mining Co.*, (1892) 95 Cal. 524, 533 [30 P. 765, 29 Am.St.Rep. 149], and other cases following the same rule, but those cases are not applicable here. In the Blanc case, it appeared that all the assets of a corporation which was indebted to plaintiff were transferred in a roundabout manner to another corporation which was organized for the purpose of holding them, and which paid no consideration therefor, the whole scheme being devised and carried out for the purpose of defrauding creditors of plaintiff's debtor. It was held that equity would regard the new corporation, against which the suit was brought, as being ''a mere continuation of the former corporation under a different name'' and hence the new corporation would be held liable to plaintiff for the debt of the old corporation, ''at least to the extent of the value of the property which it received from it without consideration.'' An essential foundation of the rule so applied is the lack of consideration running from the new company to the old. Here, as we have already held, there is no such lack. But if the rule of these cases were applicable here, it would lead only to a judgment against the California company on the note. No such judgment was given, so the trial court could not have proceeded on this theory. Moreover, this rule, being based on the essential identity of the two corporations, would afford no greater reason for preferring plaintiff's claim over a mortgage executed by the second corporation than for giving it priority over one executed by his original debtor, which, as already stated, could not be done under the circumstances of this case.

Other matters advanced by plaintiff in support of the judgment have been considered but are not deemed to merit more detailed discussion. Plaintiff's attempt, throughout the case, is to appeal to rules of equity. We see no equity in a judgment which gives to a previously unsecured creditor of a moribund corporation, whose only asset is a conditional right to acquire property by the payment of money which it has no means of paying, a lien on that property after its acquisition by means of the proceeds of a loan, paramount to that of a mortgagee who in good faith makes that loan and takes as security a mortgage which attaches to the property at the very instant of its acquisition. Such is the judgment here.

The judgment is reversed as to the defendant, the Nipissing Mining Company, Limited, a corporation.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 25, 1943.