[No. 19194.   Department Two. — October 9, 1893.]

D. W. FIELD, ADMINISTRATOR, ETC., RESPONDENT, *v.* A. S. SHORB ET AL., APPELLANTS.

ESTATES OF DECEDENTS — GIFT OF BANK CHECK AND CERTIFICATE OF DEPOSIT — ACTION BY ADMINISTRATOR — FINDING AGAINST EVIDENCE.— In an action by the administrator of the estate of a decedent wherein it is sought to set aside the transfer of a bank check and certificate of deposit by the decedent in his lifetime, upon the alleged ground that the check and certificate were given to the transferee merely for safe-keeping and not as a gift, where the evidence shows that the deceased was a wealthy man and was in the habit of keeping bank accounts; that the check was drawn payable to the transferee and was immediately collected by her, and the proceeds deposited in bank to her account, and

there is no evidence tending to show that the check was not given to her, and the evidence shows without conflict that the check and certificate were intended to be a gift to her, and that the certificate of deposit was indorsed and delivered to her by the decedent, a finding that they were not given to her as a gift is not supported by the evidence.

FINDINGS — CURRENT OF EVIDENCE AGAINST FINDING — CONFLICT — REVIEW UPON APPEAL. — Although a finding by a jury or trial court will not be disturbed on the ground that it is not warranted by the evidence where there is presented a fair, reasonable ground for a difference of opinion, yet where the great current of the evidence is against the finding or verdict, and the appellate court is convinced that it is wrong, it will not be deterred from setting it aside by the contention that one or two general statements or assertions of one or two witnesses bring the case within the rule which governs where there is a material conflict of evidence.

ID. — MENTAL SOUNDNESS OF DONOR OF PERSONAL PROPERTY — FINDING AGAINST EVIDENCE. — Where it is sought to have a gift of personal property set aside at suit of an administrator on the ground that the decedent, at the time of making the transfer, was of unsound mind, and the jury finds that the mind of the decedent was sound up to within three days of the date of the making of the transfer, and from that time on was unsound; and the evidence introduced to show the unsoundness of mind consists of statements as to the characteristics of the decedent, which characteristics were exhibited continuously for at least three months prior to the first day upon which the decedent was found to be of unsound mind, the finding of the jury as to unsoundness of mind at the date of the transfer will be set aside as not supported by the evidence.

ID. — GIFT IN VIEW OF DEATH — "UNNATURAL DISPOSITION OF PROPERTY" — ERRONEOUS INSTRUCTION. — Where a man in contemplation of death makes a gift amounting to only about one fourth of his property to friends with whom he has been quite intimate for several years, and who have done him many favors and attended to his wants during a long illness, and his only relatives are collateral kindred whom he has not seen for thirty-five years, with the exception of a nephew, who came to see him for a short time during his last illness, it is error for the court to instruct the jury, in an action to set aside the gift on the ground of unsoundness of mind on the part of the decedent, that "an unnatural disposition of property is a circumstance" tending to show unsoundness of mind on the part of the decedent.

ID. — RIGHT OF OWNER TO DISPOSE OF PROPERTY. — A person in disposing of his property in contemplation of death is not called upon to suit the tastes or views of jurors or courts.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Wilson & Bulla,* and *Stephen M. White,* for Appellants.

*W. W. Holcomb,* and *Wells, Monroe & Lee,* for Respondent.

McFARLAND, J. — This action was brought by the public administrator, acting as the administrator of the estate of Daniel J. Harris, deceased; and in form it purports to be an

action to obtain an accounting of the transactions between the defendants, A. S. Shorb and his wife, Mattie L. Shorb, and the said Daniel J. Harris in his lifetime.  But the main averments of the complaint are that on the thirteenth day of May, 1890, the deceased drew a check for $500, payable to Mattie L. Shorb, and delivered the same to her; that on the third day of July, 1890, the deceased drew another check for $1,288.25, payable to said Mattie L. Shorb, and delivered the same to her; and that also on said third day of July, 1890, the said deceased delivered to said Mattie L. Shorb a certain certificate of deposit for $25,000; that said A. S. and Mattie L. Shorb claim that said two checks and said certificate were delivered to the said Mattie L. by the deceased as gifts; but that they were not given to said Mattie L. as a gift, and always remained a part of the property of the deceased until his death, and since then have been assets of his estate.  Several banking companies were also made defendants, upon averments that portions of the money collected upon said drafts and certificate are on deposit with said banking companies.  Some twenty different issues were submitted to a jury, who returned specific answers to four or five of the issues, imperfect answers to two or three others, and "no answer" to the rest.  The court then made findings, adopting generally the judgment of the jury where it was expressed; and upon the findings judgment went in favor of the defendants for the five-hundred-dollar check, the court holding that it was a gift, but against the defendants as to the other check and as to the said certificate of deposit.  The defendants appealed from the judgment, and from an order denying a new trial.

The complaint seems to go upon three theories: 1. That the check and certificate were obtained from the deceased by the defendants (the Shorbs) by means of a conspiracy through which they were obtained by undue influence exerted upon the deceased; 2. That they were delivered to Mrs. Shorb merely for safe-keeping, and always remained the property of the deceased; and 3. That at the time they were delivered on July 3, 1890, the deceased was of unsound mind and incapable of giving the said certificate and check for any purpose.

About seven or eight pages of the complaint, as it appears on

the printed transcript, is make up of averments of fraudulent conspiracy entered into by the Shorbs for the purpose of obtaining undue influence over the deceased, and obtaining from him the certificate and check.    It is averred, with many details and frequent repetitions, that the defendants, the Shorbs, fraudulently conspired to obtain undue influence over the deceased by great exhibitions of friendship and affection, by trying to persuade the deceased that they were his only friends, by persuading him to employ the said A. S. Shorb as his physician, by supplying him with and inducing him to use large quantities of intoxicating liquor for the purpose of weakening his mental condition, and by many other acts which tended to give them control over him; and that thus having fraudulently according to their conspiracy and plan obtained great influence over him, they induced him by solicitation to give said check and certificate to the said Mattie L. Shorb.    With respect to this part of the complaint it is sufficient to say that the court found that none of the said allegations as to said alleged conspiracy and fraudulent purpose to obtain influence over said deceased were true.

With respect to the second theory of the complaint above noticed, we suppose that the findings of the court are to be taken to mean that the said check and the said certificate were given to Mrs. Shorb on the third day of July, 1890, merely for safe-keeping, and not as a gift.    But we find no evidence sufficient to sustain such a finding — that is, leaving out of view for the present the question of the mental unsoundness of the deceased at the time.    The check was drawn payable to Mrs. Shorb, and was immediately collected by her and the proceeds deposited in bank to her account, and it does not appear that the deceased ever called upon her afterwards for said proceeds, or made any question about it; and there is no evidence tending to show that the check was not given to her as her own property, while her own testimony is directly to the point that it was a gift.    With respect to the certificate, there is the testimony of three witnesses that he had expressed his intention before the 3d of July to give said certificate to Mrs. Shorb as a gift; and there is the direct testimony of Mrs. Shorb that he did so give it to her on that day, and there is no testimony to

the contrary. Moreover, there is the unquestioned act of the deceased in indorsing said certificate and delivering it to Mrs. Shorb. This certificate had been in the month of May previous given to Mrs. Shorb for safe-keeping. It was a negotiable instrument, and when given to her in May for safe-keeping had not been indorsed; the legal title thereto had not passed to Mrs. Shorb, and she could not have disposed of it in any way. But afterwards, when the certificate was brought to him on the 3d of July for the purpose, as Mrs. Shorb testifies, of making a gift of it to her, he then indorsed his name on the back of said certificate, and delivered it to Mrs. Shorb. This indorsement and the delivery of the certificate to Mrs. Shorb transferred to her the entire right to collect said certificate, or to dispose of it as she thought fit. And there is not the slighest evidence, either at that time or afterwards, that he intended her to collect the money and give it to him. The deceased was a man who owned large properties, and was in the habit of keeping bank accounts, both in the territory of Washington and in Los Angeles; and he had, certainly, the ordinary business knowledge of negotiable bank paper, and the methods by which the title to the same is transferred. Taking all these matters into consideration, we see no evidence upon which to found a reasonable belief that he did not intend to give said certificate to Mrs. Shorb in manner as she testified — that is, presuming, as before stated, that he was not so mentally unsound as not to know the quality of his acts or to do ordinary business. The only real question in the case, therefore, relates to the condition of the mind of the deceased on the said third day of July, 1890, when these transactions took place.

With respect to the mental soundness of the deceased on said 3d of July, the question propounded to the jury, and the answer thereto, are as follows: "Was the mind of Daniel J. Harris during his last illness weak, and if it was, for about how long was it in such condition? Yes; from about July 1st until his death." Upon this subject the court first found as follows: "The mind of Daniel J. Harris during his last illness, from about July 1st until his death, was weak and unsound"; and then as follows: "Prior to the 1st of July, 1890, Daniel J. Harris was not of unsound mind, but then, and at all times

thereafter, until the time of his death, he was of unsound mind, and not competent to make a gift of said sum," etc. These findings of the court were, we presume, founded upon the judgment of the jury, as expressed in their finding as above stated.

We are adverse to holding that a finding by a jury or trial court on an issue of fact is not warranted by the evidence, whatever we might think as to its preponderance, where there is presented a fair, reasonable ground for a difference of opinion, and where a conclusion either way could not be considered as the necessary result of the exercise of an unsound judgment. But where the great current of the evidence is against the verdict, and we cannot escape the conviction that it is wrong, we should not be deterred from setting it aside by the contention that one or two general statements or assertions of one or two witnesses bring the case within the rule which governs in cases where there is a *material* "conflict of evidence." And in the case at bar we cannot resist the conclusion that the evidence is insufficient to support the finding of the unsoundness of the mind of the deceased on July 3, 1890.

The facts upon which the mental weakness or unsoundness —*insanity* not being claimed—are based are certain characteristics and conduct of the deceased. As to those characteristics themselves, there is a great conflict of testimony — some of the witnesses making them very extravagant, and others describing them as little, if any, out of the normal. We assume, however, that the jury had the right to take the most highly-colored picture. Those characteristics were mainly these: That the deceased was very close and penurious in money matters, or, as some witnesses said, niggardly and miserly; that although a man of means, he worried over the expenses of his last sickness, and said he would become a pauper; that he was loath to buy proper food; that he was untidy and uncleanly in his habits, did not like to be washed, and could with difficulty be induced to make necessary changes of clothing; that he was subject to crying spells, and sometimes without apparent cause; that he frequently grumbled to himself; that he would get mad and swear terribly; that he feared people were friendly to him because they wanted his money; that he talked about women in an obscene way; that he occasionally beat upon the keys of a

piano without being able to play that instrument, and would
then walk about the room in a quaint or unnatural way; and
that he predicted that the city of Los Angeles would be visited
in 1890 by an epidemic which would kill many thousands of
people, and which he could avert by going away.   These were
the main characteristics, although we do not pretend to give the
details; and the witnesses differed very much as to the degree
or intensity of these traits of character.   (We leave out of view
the bald assertion of one of the witnesses who was his nurse
from sometime in May to the middle of July, and who disliked
the deceased, and was evidently very hostile to appellants, that
deceased was guilty "every day" of a certain private practice
that sometimes impairs the mind.   He gave no details, and
never mentioned the subject to either of the doctors in attend-
ance while he was acting as nurse; and neither of the three
doctors who attended upon the deceased noticed any symptoms
of such a practice.   Moreover, the weak physical condition of
the deceased, produced by heart disease and consequent dropsy,
showed to the common mind, even without the information
given by Dr. Salisbury, that the thing asserted by the witness
was "impossible."   We apprehend that neither the jury nor
judge gave any weight to the assertion.)

If the jury had found that the foregoing characteristics and
acts of deceased were, during the time when they were shown
to have existed, and to have been committed, sufficient to war-
rant the conclusion that he was of unsound mind, we might
not, perhaps, have felt called upon to set aside the finding—
although we would not have looked upon the evidence support-
ing it as very strong.   But the jury, in the face of these char-
acteristics and acts, which were the same for as long a period
before the 1st of July as after that date, found that the deceased
was of unsound mind only "from about July 1st until his
death"; and the court, following, no doubt, the judgment of the
jury, found that "prior to the first day of July, 1890, Daniel J.
Harris, was *not* of unsound mind"—but that *then* and after-
wards he was.   The evidence discloses the deceased afflicted as
early as April, 1890, with the last illness—heart disease and
dropsy—which caused his death on the 18th of August follow-
ing; and his characteristics upon which the finding of mental

unsoundness was based were exhibited continuously throughout that entire period, and were as full and pronounced during any one part of that period as during any other. The first witness introduced by respondent was a physician who attended the deceased from the 6th of May until the 23d of June, when he was discharged; and he described nearly all the traits of character and conduct of the deceased which are relied on, as existing in their fullest development during the said period of his attendance, and testified that he was much better in health on June 23d than he was when he first saw him on May 6th. The next witness (Hapgood) testified to the same things as occurring during ten days in May while he nursed the deceased. The next (Hunsaker) testified to many of the same things as occurring nine months before the deceased died. The next, a milkman (Burch), testified to the said characteristics and conduct of the deceased as existing during all the months of May, June, July, and August. The next witness on the subject (Brown), who was very pronounced in his statements of the condition of the deceased, described his traits of character and conduct as observed by the witness "in the month of May," and said that he " was not much acquainted with him from that time on." The next witness (Anderson), who described the characteristics of the deceased, referred to a period so early that the objection of the remoteness. of his testimony was made. It referred to visits made by the deceased to the office of the witness before the last illness of the former. This witness testified to the prediction by deceased of the epidemic at Los Angeles, and he said it occurred "during the winter of 1889–90, and up to March and April." The next witness (Davis) testified to the epidemic matter as occurring before the last illness of deceased. The next witness (Mrs. Trundey), who also testified to the condition of the deceased, said: "The last time I saw him was in the early part of last year — in the spring or summer." · The next (Bryant) testified to the condition of the deceased from "May to August," and when describing his characteristics made no distinction as to time. The next and the strongest witness for respondent (Purssord) was employed as nurse from May 18th to July 15th; and, with one exception hereinafter noticed, he describes all the facts which he marshals as showing the

characteristics of the deceased as continuously existing from the moment he first went to the house on May 18th. The only witnesses introduced by respondent whose testimony as to the conduct and characteristics related solely to a period after July 1st were McCallister, Helander, and B. F. Harris; and their descriptions of the deceased differed in no material way from the descriptions given by the other witnesses for respondent, and which applied to the whole period from April to the 1st of July. And it was testified by witnesses for the appellants that many of the characteristics of deceased above referred to had existed for several years previous to 1890 — although in the opinion of *these* witnesses the said characteristics did not amount to mental unsoundness. Moreover, the long hypothetical question, covering two pages of the transcript, put by respondent to certain medical experts, in which all the characteristics and acts of deceased claimed to be peculiar were described with high coloring and frequent repetition, referred, in terms, to all the months of " May, June, July, and a part of August, 1890," and was substantially as fully applicable to May and June as to July.

It was found, however, that the mind of the deceased was *not* unsound until the 1st of July; and that being so, was there any evidence reasonably sufficient to support the finding that his mind became unsound within the three days between the 30th of June and the 3d of July — the important day on which the alleged gifts were made? There was no such evidence. We are not called upon to determine whether the evidence of the condition of the deceased during the months of May and June would have been sufficient to warrant a finding that during those months he was of unsound mind ; for the finding is that it was *not* sufficient for the purpose. And there was no different evidence — and therefore no evidence — to support a finding that he was mentally unsound on July 1st.

It is proper to say that respondent makes some little contention that deceased had a paralytic stroke that might help out the finding under discussion. But there was no evidence of a paralytic stroke which a sensible jury could have attached the slightest importance to. One of the witnesses for the respondent, a nurse, did make the naked assertion that one morning

when deceased fell on getting out of bed "he had a paralytic stroke"; but the witness was not a medical expert, and the evidence nowhere shows any symptoms of paralysis. The witness don't pretend that he said anything to the attending physician about a paralytic stroke, and the physician says nothing about any such occurrence. Afterwards, Dr. Salisbury, an entirely disinterested, and apparently an exceedingly intelligent witness, attended the deceased for a week. He examined the case very thoroughly, and explained very fully and clearly the character of the disease with which deceased was afflicted; but he says nothing of any evidence of paralysis. The deceased during his entire sickness was subject to good and bad spells. At times he was quite weak physically, and his disease made it frequently difficult for him to walk about much, and it was quite probable that he had a fall; but there was certainly no evidence at all sufficient to warrant a finding that he had a stroke of paralysis. Moreover, it is clear that the time alluded to by the witness was after July 3d. He first said that it was "about the 1st of July"; but he afterwards said, "I got Mr. Brown to telegraph for Mr. Harris' nephew sometime about the 1st of July, when he had this stroke." But Mr. Brown testified that he telegraphed for the nephew "about July 9th"; and then, having testified that the telegram would show the exact time, it was produced and was of the date of July 10th. It appeared, also, that after this the health of the deceased was better than usual. Under these circumstances the supposition that the mind of the deceased suddenly became unsound between June 30th and July 3d, by reason of a stroke of paralysis, affords no prop which helps to sustain the finding in question.

Indeed, it is quite probable that the finding was the result of a notion frequently entertained by jurors (and sometimes by courts) that a man should dispose of his property in contemplation of death in such manner as to suit the tastes and ideas of propriety of the jurors. It was probably thought that deceased should not have given so much to one not of his blood, when he had collateral kin; and that the $500 check, which they found him sound-minded enough in May to give, was enough for Mrs. Shorb. But, as we said in the *Estate of Spencer,* 96 Cal. 448, a person in thus disposing of property

is "not called upon to consult the wishes or views of jurors or courts." We notice that at respondent's request the jury were instructed that "an *unnatural* disposition of property is a circumstance," etc. Of course, when a man wills all or most of his property away from his wife or children with whom he lived on apparently friendly terms, or even from other relatives with whom he was intimate, and to whom he seemed attached, that fact should have weight in determining the mental condition of the testator; but such a consideration should have little, if any, force in the case at bar. The deceased was a widower without children or lineal descendants, and had no kith or kin living nearer California than the state of New York. He ran away from home when a boy and lived most of his life on the Pacific Coast, and had not seen any of his collateral relations for thirty-five years, except a nephew, who, at the solicitation of the witness Brown, came out from the east during the last illness of the deceased and stayed two weeks, the deceased furnishing him money to go back. On the other hand, the defendants, the Shorbs, had been quite intimate with him for several years. They seem to have been about his only family friends, and had done him many friendly offices. The lady whom he married, and who died in 1888, had before her marriage lived with said defendants. During the marriage there was a difficulty between the deceased and his wife, and the latter brought a suit for divorce, but through the efforts and influence of the Shorbs a reconciliation took place, and the parties seemed to live very happily together until the death of the wife. Afterward the intimate relation was continued between the deceased and the defendants; and during his long final illness Mrs. Shorb and her daughter ministered daily to his wants, taking him delicacies to eat, trying to brighten his gloomy and lonely surroundings, and doing for him many things in their nature unpleasant. Under these circumstances we see nothing "unnatural" about his making the gifts in question. It is to be observed also that these gifts did not include all his property.

He was worth in round numbers $100,000, and the gifts amounted to only about one fourth of that sum.

It is difficult to know what value to attach to the findings (27 and 28) that the Shorbs, by reason of their previous acquaint-

ance, sympathy, attentions, etc., but "not otherwise," could "easily influence and control" the deceased, "but not so as to deprive him entirely of his free will," for it is expressly found that the said defendants did not use any influence to procure the gifts in question. It is expressly found that "neither the defendant, Mattie L. Shorb, nor the defendant, A. S. Shorb, importuned or solicited said Harris to transfer or deliver to Mattie L. Shorb either the check for five hundred ($500) dollars heretofore referred to, or the check for twelve hundred and eighty-eight and twenty-five one-hundredth ($1,288.25) dollars heretofore referred to, or the said certificate of deposit for twenty-five thousand ($25,000) dollars issued by the Merchants' National Bank of Tacoma"; and all the averments of the complaint, as to a conspiracy by defendants to obtain and use undue influence over the deceased, are expressly negatived by the findings. If the said findings (27 and 28) mean anything more than that defendants merely had that influence which comes from kindness and affection, and which is not "undue," then they are not supported by the evidence, and are inconsistent with other findings. But under any view that may be taken of them it is clear that the one pivotal question in the case is, Was deceased on July 3d of unsound mind and incapable of making a gift?

Under the foregoing views, we do not deem it necessary to discuss the other questions presented in the record.

The judgment and order appealed from are reversed, and the cause remanded.

DE HAVEN, J., and FITZGERALD, J., concurred.

Hearing in Bank denied.