[Civ. No. 21327. Second Dist., Div. Two. Nov. 16, 1956.]

MARGARET B. FOWLER et al., Appellants, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), as Trustee, etc., et al., Respondents.

38

Loeb & Loeb and Herman F. Selvin for Appellants.

Chandler, Wright, Tyler & Ward for Respondents.

MOORE, P. J.—Plaintiffs appeal from a judgment in their action to impose a constructive trust upon property left by their deceased father, Warren McGrath. The contentions are that the findings are not supported by substantial evidence, and that the opinion of the trial judge indicates that because of an erroneous conception of the law he refused to consider and weigh the majority of appellants' evidence.

On April 24, 1895, the testator and his first wife, Lottie, were married. During the following 51 years they raised four daughters and accumulated a considerable fortune. Lottie died March 13, 1946, leaving no will. A portion of her separate property which devolved by the law of intestate succession was quitclaimed to the father, Warren, by the four daughters at his suggestion. The testator was then 74 years of age. A little over one year after Lottie's death, he married his secretary, Callie, a woman 28 years his junior. By his final will, executed after his marriage to Callie, Warren left one fourth of his property outright to her; the balance in trust with one half of the oil income and one third of the remaining income to Callie for life, the daughters or their issue to receive the residue of the income until Callie's death and all of the income thereafter. Upon the death of the survivor of them,

the trust estate is to go in equal shares to the surviving issue of the daughters per capita.

## ALLEGED GROUNDS FOR THE ACTION

The daughters brought this action alleging that the testator and Lottie had entered into a parol contract that the first to die would leave all his property to the survivor, who in turn would bequeath it in equal shares to the daughters; that Lottie died intestate in the belief that her husband would succeed to her estate and in reliance on his promise to make the children his eventual beneficiaries; that the final will of Warren McGrath unconscionably violates his promise in that his second wife and the children of his daughters are given some interest in his estate. Furthermore, they urge that they quitclaimed to their father that portion of Lottie's separate possessions which would have gone to them upon her death in reliance upon his representation that they would eventually inherit Lottie's property in addition to his own estate.

## THE FINDINGS

The trial court found that no parol contract between Warren and Lottie had ever been formulated; that Lottie had relied on no such agreement at the time of her death in 1946; that Warren did not promise his daughters that he would will all his property to them in return for the quitclaim of a portion of Lottie's separate property.

## EVIDENCE OF AN ORAL CONTRACT

Appellants' only evidence of the existence of a parol contract between the testator and Lottie is the various declarations of decedent testified to by the four girls, a friend, a bank executive and two ministers acquainted with Warren. The purport of all these declarations was that Warren and Lottie had an ''agreement'' as to the manner of the disposition of their property in event of death of both or either, and that the daughters were to have a substantial share in that disposition.

Margaret Fowler testified that Warren had stated in her presence that ''Mama and I have always agreed that everything shall go to you girls and it will probably be your responsibility to take care of most of it because the other girls have other interests.'' Upon another occasion, he remarked that he and ''mama'' had agreed that everything should go to the four girls after the two of them were gone; ''You know mama and I have had that agreement all our lives, everything

would go to you girls, we have spent our lives working for everything for you girls, and that is what it is going to be.''

Mildred Shank asserted that the decedent had said to her that ''Lottie and I have arranged an agreement whereby either one of us will have the estate for our lifetime and at the death of both of us it will be divided between the four of you.'' The other two daughters recalled similar conversations with their father. According to each of them, Warren had mentioned that he and Lottie ''understood'' that the girls were to receive a substantial portion or all the property held by the parents. Mr. McGrath at one time told Paul Neushaeffer, vice president of a bank, that he was not interested in setting up any trusts with the bank as trustee since ''as long as I am capable I want to attend to my own business because I am looking after my girls. . . . My girls are everything that I have and what I have is for them.'' A similar statement was made by decedent to Mrs. A. C. Pancoast.

Reverend J. Whitcomb Brougher, Jr., testified that Warren McGrath had intimated to him that ''he had an obligation, he felt, to . . . his daughters because . . . it was his and Lottie McGrath's plan to set up a program whereby the estate would fall to his daughters and since Lottie had passed away he said 'I think I should talk with them because they are the ones who are primarily involved [in any plan to contribute to a church building program].' ''

Reverend James W. Fifield, Jr., testified that ''he told me at that time and on numbers of other times that the plan was that the resources that he and his wife had accumulated in their partnership was to go to the girls, the children, and presumably pass on to the grandchildren . . . and he always said that he felt it was his duty and that he felt honor bound with his wife to carry out this program for the children.''

In order to prove reliance by Lottie upon such a ''contract'' as would estop decedent's legatees and devisees from asserting the statutes which require such agreements to be written (Civ. Code, § 1624, subd. 6; Code Civ. Proc., § 1973, subd. 6), the husband of one of the daughters testified that Lottie told him on her deathbed that she had not made a will nor would she make one because ''for years she and Warren had talked about what they wanted to do, that Warren understood her ideas on the subject, that everything was to go to the girls, that was their plan, they had discussed it in detail and everything was as she wished it.''

Respondents countered by introducing into evidence, with-

out objection by appellants on any tenable ground, eight previous wills of Warren McGrath. The last one was dated January 18, 1946. These wills, executed during the period that the oral contract between Lottie and Warren supposedly existed, presented a display of testamentary schemes differing in many respects from the alleged oral agreement. To be sure, in all the wills the daughters were extensively provided for; but the testator created various trust schemes, in some of which his grandchildren took a share as well as his daughters. These wills are cogent evidence explaining the meaning of Warren's several statements relative to his "understanding" with Lottie. They indicate either that the testator felt that his discussions with Lottie were not intended by either to be in the nature of a binding contract but rather mere family planning; or that if there was an agreement, its terms did not prevent Warren from utilizing various testamentary schemes to achieve the substance of the agreement which was to provide liberally for his daughters.

Other witnesses testified that in the meetings over the estate which followed the testator's demise, the daughters expressed disappointment over the size of their gifts but were strangely silent relative to any existence of a contract to dispose of the property otherwise. A. Calder Mackay, attorney for Warren McGrath, and C. W. Smith, vice president of a national bank, testified that at no time during the extensive negotiations over the prospective probate of the estate did any of the appellants indicate that they claimed the whole of the estate in contravention of the terms of the will.

On cross-examination, two of the witnesses for the plaintiffs testified that they were intimately acquainted with decedent and that it was their opinion that his character was such as would prevent him from ever violating a promise he had indeed made.

Also on cross-examination, one of the daughters admitted that Lottie McGrath was undoubtedly familiar with the California laws of intestate succession at the time she died. Therefore, she was aware that her property which she held separately would not pass in its entirety to her husband in accordance with the agreement which appellants claim existed at that time. The inference is that Lottie could not have relied upon the asserted oral "understanding" between herself and Warren. A further inference is that if there was such an agreement, its terms did not demand that the spouse first

to die must will *all* the property to the survivor who in turn would will his *entire* estate to the daughters.

## FINDINGS SUPPORTED BY EVIDENCE

Was the evidence introduced by respondents as beneficiaries of the last will sufficient to support the finding that no oral contract to dispose of his property otherwise had been entered by the testator? Not only are the appellants here under the ordinary burden of persuasion in a civil case, but since they are seeking to impose a constructive trust upon the estate of a deceased person in contravention of his expressed testamentary wish, they must establish ''the oral agreement by *full, clear, and convincing evidence* . . . and . . . that plaintiff suffered an *unjust and unconscionable* injury and loss by reason of the failure of decedent to bequeath and devise all . . . property [to them].'' (*Khoury* v. *Barham,* 85 Cal. App.2d 202, 211 [192 P.2d 823], emphasis added; *Notten* v. *Mensing,* 3 Cal.2d 469, 477 [45 P.2d 198]; *Monsen* v. *Monsen,* 174 Cal. 97, 103 [162 P. 90]; *Barham* v. *Khoury,* 78 Cal. App.2d 204, 211 [177 P.2d 579]; *Notten* v. *Mensing,* 20 Cal. App.2d 694, 696 [67 P.2d 734].) Therefore, appellants must convince this court not only that they presented the preponderance of the evidence, not only that the evidence was clear and convincing, but that it was error for the trial court not to be so convinced of its verity as to upset the testament. ''It must be remembered that testimony of oral declarations or admissions (particularly those of persons who have been silenced by death) form a class of evidence which is not highly favored in the law.'' (*Monsen* v. *Monsen, supra,* p. 103.)

Appellants fully recognize that appellate courts will not reverse findings by a trial court where there is any substantial conflict in the evidence, but point out that ''where the great current of evidence is against the verdict [or finding], and we cannot escape the conviction that it is wrong, we should not be deterred from setting it aside. . . .'' (*Field* v. *Shorb,* 99 Cal. 661, 666 [34 P. 504].) It is interesting to note that of the 21 cases cited by appellants in support of this position, 16 reversed judgments in *favor* of the party with the burden of persuasion. Here the judgment is against that party. No case has been cited reversing the refusal of a trial court to find the existence in the evidence of grounds for a constructive trust.

Consider the very nature of all attempts to impose a constructive trust upon an estate because of an alleged oral agree-

ment. In almost every case it must be very difficult for the proponents of the will to introduce any evidence directly rebutting the existence of such a contract. Plaintiffs claim that the testator made an oral promise to them. Who is alive to testify to the contrary? Respondents here were fortunate to muster the contradictory evidence, namely, the inconsistent wills, the strong, forthright and honest character of decedent, the silence of appellants at a time when they should ordinarily have asserted their claims, and Lottie's death without a will to leave all her property to Warren. Such evidence warrants inferences in conflict with the proof adduced by appellants and is sufficient to support the findings.

Appellants make much of the fact that a short gap existed between the date of the last inconsistent holographic will of decedent and the death of Lottie, and that during this period Warren made some further declarations relative to an "agreement" with Lottie. Therefore, the argument runs, for this critical period of time, appellants' testimony is absolutely uncontradicted. Surely plaintiffs in an action to declare a constructive trust are not entitled to a decision as a matter of law merely because no contradiction exists as to their evidence of occurrences during a short period of an allegedly long and continuous series of interrelated events. If in spite of appellants' testimony of the repeated admissions of a contract made by the testator before January 18, 1946, (the date of the last will before Lottie's death) no contract yet existed, the inference is strong that further similar declarations of the decedent did not evidence the creation of an oral contract between that time and his wife's decease.

The case of *Notten* v. *Mensing, supra,* 20 Cal.App.2d 694, is apropos. There appellants attempted to prove an oral contract not to revoke a will. The evidence also consisted of declarations of the decedent relative to an "agreement." The appellate court refused to upset a decision for the proponent of the subsequent will. *Khoury* v. *Barham, supra,* 85 Cal.App. 2d 202, reached a similar result.

The alleged, oral promise by Warren to will all his property to the daughters in exchange for their quitclaim to him of that portion of Lottie's property which they had inherited was dependent upon the existence of a prior contract with Lottie. If that agreement was not proved, neither was the subsequent quitclaim transaction. The trial court was justified in finding, after hearing evidence of the dominant role Warren McGrath played in the management of family affairs,

that his daughters would readily quitclaim to him the small estate left them by Lottie if he should so suggest without the necessity of any return promises.

### FINDINGS NOT BASED ON MISAPPLICATION OF LAW

Prior to adopting findings of fact, the trial judge spoke an accompanying opinion from the bench which he prefaced by stating "I think the case before me and the decision I render will warrant an appeal and that it should be taken. . . . The first important question here for determination by this Court is whether the evidence is or is not sufficient as a matter of law to sustain the claim that there was a binding agreement among the parents. Now, the mere fact that the trial court accords credibility to the testimony offered and received to sustain a claim or a defense is not yet sufficient if the evidence is not sufficiently specific to meet the controlling rules of law that are applicable. My difficulty here in this case arises right at that point."

The opinion of a trial court is not a part of the findings and thus is not the decision of the court. The opinion is merged in and controlled by the judgment and may not be used to impeach the findings. (*Gschwend* v. *Stoll,* 104 Cal.App.2d 806, 809 [232 P.2d 494].) However, where remarks of the trial judge indicate that he decided the case as he did because of a misapprehension of the law and never truly exercised the judicial function of weighing the conflicting evidence, accepting some and rejecting the other, the judgment may be reversed if necessary for a true decision on the evidence. (*Estate of Gestner,* 90 Cal.App.2d 680, 686 [204 P.2d 77]; *Trans-Oceanic Oil Corp.* v. *Santa Barbara,* 85 Cal.App.2d 776, 790 [194 P.2d 148]; *Felsenthal* v. *Warring,* 40 Cal.App. 119, 134-135 [180 P. 67].) Appellants suggest that the opinion of the trial court here indicates that he was of the impression that a contract could not be proved by the subsequent declarations of the contracting parties without direct evidence of the very circumstances wherein the contract was consummated. That is not the law.

The admissions, or declarations against interest as the case may be, of a party to a contract may be sufficient under the circumstances to prove the existence and terms of that agreement. (*Steinberger* v. *Young,* 175 Cal. 81, 86 [165 P. 432]; *Bean* v. *Wilson,* 120 Cal.App.2d 58, 61 [260 P.2d 134]; *Airola* v. *Gorham,* 56 Cal.App.2d 42, 47-49 [133 P.2d 78].) However, we do not agree that the trial judge was under

this misapprehension of the law or that his findings were indeed based upon such a consideration.

Some of the witnesses presented by plaintiffs are wholly disinterested in the outcome of this action. Their character is such that it would be unthinkable that they would deliberately falsify testimony before a court of law and under oath. As stated by the trial judge, ''The recollection of the witnesses in this case may not in all respects be strictly accurate particularly in respect to the language used by the decedent Lottie or the decedent Warren McGrath but I see no reason to doubt the credibility of the witnesses even though the recollection of some of them may not be entirely accurate and therefore may not be entertained.'' Thus, assuming that appellants' witnesses spoke the truth insofar as they were able, is it yet not possible that respondents were entitled to a decision in their favor?

An important key to the decision is the admonition of the judge that ''It is not unusual for parents and their children to have a general family understanding that the surviving parent will take all the assets and that the surviving parent will leave the assets then or pass them on to the children. Discussions are often had to that effect in families but are such discussions to be classed as contracts? My wife has said time and time again 'I want to leave my property to you and I want you to give it to our three daughters.' I said, 'That is exactly my idea of things too.' Have we entered into a contract? I don't think so.'' To which it may be added, perhaps you have and perhaps you have not. It depends upon the circumstances, the words and phrases employed, the understanding of the parties, the type of family involved. When persons reach the age attained by Lottie and Warren McGrath and accumulate a sizeable fortune, it is natural to suppose that they oftentimes discusss what would happen to their wealth should either die. ▮▮▮ Whether these spoken ''plans,'' ''understandings,'' or ''agreements'' are intended by the family members as a binding contract among them is a question of fact for the trial court. Here that court was of the opinion that Mr. McGrath ''was a man of unusual attainments and a very forcible character. If he had been requested at any time in his life to enter into an agreement with his wife to the effect that he would be bound to handle all the property after his wife's death toward giving it to the daughters he never would have done it. He was the type of man who had made his way and he was the type of man

who could not be thus restricted." Therefore, his family would not be entitled to believe that their normal family planning constituted more than a moral obligation on each member.

 A contract is indeed the result of objective manifestations of the parties. If those manifestations are sufficient, the parties' subjective intentions or beliefs are wholly immaterial. (Civ. Code, § 1565, subd. 3; *Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128 [48 P.2d 13]; Rest., Contracts, §§ 3, 19-20.) However, the same interchange of words may or may not be a binding contract depending upon the circumstances under which the words are uttered, the tone of voice used, to whom they are addressed. If words are spoken under circumstances where it is obvious that neither party would be entitled to believe that the other intended a contract to result, there is no contract. As lucidly pointed out by Justice Learned Hand, "the form of utterance chosen is never final; it is always possible to show that the parties did not intend to perform what they said they would, as, for example, that the transaction was a joke . . . or that it arose in relations between the members of a family which forbade it. . . . It is quite true that contracts depend upon the meaning which the law imputes to the utterances, not upon what the parties actually intended; but in ascertaining what meaning to impute, the circumstances in which the words are used is always relevant and usually indispensable." (*New York Trust Co.* v. *Island Oil & Transp. Corp.*, 34 F.2d 655, 655-656.) Furthermore, appellants never did prove the "objective manifestations" of this alleged contract. They could only testify to declarations by the decedent that some such manifestations had indeed occurred and that an "agreement" resulted. Therefore, the so-called objective test to be applied to alleged contract transactions does not solve this case.

 Before a court of equity will decree "quasi-specific performance" or impose a constructive trust against the estate of a decedent in derogation of his expressed testamentary desires, the plaintiffs must prove that they would be the victims of a "fraud" should the agreement not be enforced. (*Walker* v. *Calloway*, 99 Cal.App.2d 675, 681 [222 P.2d 455]; *Brown* v. *Freese*, 28 Cal.App.2d 608, 615 [83 P.2d 82]; *Kurtz* v. *de Johnson*, 42 Cal.App. 221, 227 [183 P. 588].) The terms of the agreement must be definite and certain. (*Bank of America* v. *O'Shields*, 128 Cal.App.2d 212, 215 [275 P.2d 153].) Therefore, appellant was under the burden of con-

vincing the trial court that the various declarations of the decedent indicated definitely and certainly that a fraud would be worked upon the daughters of the testator should their children or the decedent's second wife be allowed to take any share in his estate. As pointed out by the trial judge, "Is there anything unconscionable in what was here done? The decedent left one-fourth of his estate to his widow, Callie McGrath, *three-fourths of the estate to his daughters*, and their interest was taken subject to a half-interest in the income—I think it was of oil or gas—maybe it was larger—and another half-interest in the income from other properties so the girls, therefore, in effect, if we compute it received the full mother's share when you add it up." The testimony introduced by appellants indicates that the decedent and Lottie felt a strong obligation to see that the survivor of them was well cared-for and that a substantial portion of their estate eventually devolved upon their children. However, the holographic wills of Warren McGrath and the death of Lottie intestate indicate that neither was bound to pursue any particular testamentary method to achieve this objective. To sustain appellants' claim that the "agreement" between Lottie and Warren absolutely required the latter to bequeath and devise all his property in a lump to the daughters would prevent the decedent from achieving considerable tax savings by the formation of a well-considered estate plan. Considering the size of the McGrath estate, it is unlikely that the husband and wife ever intended to reach such a result. Furthermore, so to hold would preclude a subsequent wife of the testator from receiving upon his death *any portion of the property which was his to bequeath.* ■ Equity is loath specifically to enforce a contract which would prevent a testator from fully providing for his wife, a natural and legitimate object of his bounty. (*Owens* v. *McNally*, 113 Cal. 444, 453 [45 P. 710, 33 L.R.A. 369].)

Therefore, the evidence is sufficient to support a finding either that no contract was made, or that its terms were too nebulous to preclude the eventual testamentary disposition actually made by the testator. Consideration of the trial court's remarks from the bench does not change this conclusion.

### ADMISSION OF EVIDENCE

Appellants introduced into evidence certain statements made by Lottie on her deathbed, out of the presence of the testator, indicating her belief that an "agreement" existed. The trial

court allowed such declarations to be introduced solely for the purpose of showing Lottie's state of mind. Appellants now contend that the declarations were against her pecuniary and proprietary interest at the time as known by her and should have been admitted to show the existence of a contract. (Code Civ. Proc., § 1870, subd. 4.) The simple answer is that they were self-serving hearsay statements and inadmissible to prove the contract. The statement of a dying declarant that the beneficiary of the declarant's property is contractually bound eventually to distribute all his assets to certain third persons is certainly not against the interest of the speaker.

Appellants' complaint against the introduction of Warren's holographic wills is raised for the first time on appeal. Therefore, it cannot constitute a ground for reversal.

Affirmed.

Fox, J., concurred.

Ashburn, J., did not participate herein.

Appellants' petition for a hearing by the Supreme Court was denied January 8, 1957.