490 P.2d 21

VINNELL CORPORATION, a California corporation, and Aetna Casualty and Surety Company, a Connecticut corporation, Appellants,

v.

STATE of Arizona, ex rel. Bob SKOUSEN CONTRACTOR, INC., Appellee.

No. 1 CA–CIV 1473.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 4, 1971.

Rehearing Denied Dec. 13, 1971.

Review Granted Feb. 7, 1972.

Lewis & Roca, by Peter D. Baird, Phoenix, for appellants.

Fennemore, Craig, von Ammon & Udall, by Calvin H. Udall, Phoenix, for appellee.

JACOBSON, Presiding Judge.

May a subcontractor who relinquishes control of the subject matter of the subcontract to the general contractor pursuant to a written agreement, subsequently sue the general contractor for breach of the subcontract on the basis of a wrongful take-over?

This is the basic question presented by this appeal of an action instituted by plaintiff-appellee, Bob Skousen Contractor, Inc. (Skousen) against defendant-appellant, Vinnell Corporation (Vinnell). Both appellee State of Arizona and appellant Aetna Casualty and Surety Company are nominal parties, insofar as the merits of this appeal are concerned. The gravamen of Skousen's action was the wrongful termination of its subcontract by Vinnell and its subsequent damages flowing therefrom. Vinnell has appealed a judgment entered on a jury's verdict in Skousen's favor for the sum of $42,500.[1]

In early 1966, Vinnell was awarded the prime contract by the Arizona Highway Department to construct a segment of the Duncan-Alpine Highway north of Clifton, Arizona. In part, Vinnell was to construct a highway along the rock face of a hillside above the bed of the San Francisco River. At time of trial it was generally conceded that because of the proximity of the river, the quality of the rock to be excavated, the rough terrain and access problems, this was a difficult project.

The prime contract called for completion of the project by Vinnell by February 15, 1967. This date was subsequently extended by the State to March 31, 1967, the actual date of completion.

Prior to bidding on the prime contract, Vinnell had requested Skousen to submit a bid on subcontracting a portion of the project consisting of bank protection and grouted riprap. The bank protection was to extend from the bed of the San Francisco River up the slope to the location of the new highway to prevent the river from undermining and eroding the new road and its embankments. This bank protection is called riprap. The grouted riprap is a reinforced cement protective apron used also to prevent erosion.

Pursuant to this request for the subcontracting job, the president of Skousen and a representative of Vinnell visited the jobsite in December, 1965. The San Francisco River at that time was running bank to bank and was approximately ten to twelve feet deep due to winter moisture runoff.

Thereafter, Skousen submitted a bid to Vinnell for the subcontract work based upon $37.50 per lineal foot of riprap to be installed. After Vinnell was awarded the prime contract by the State, Skousen was again contacted by a representative of Vinnell, who advised Skousen that it had not been awarded the subcontract because of

---

1. The verdict in this matter consists of damages in the sum of $35,000 and attorney fees in the sum of $7,500.

its high bid, however Vinnell desired Skousen to do the job and wanted to "work something out".

Vinnell was informed that the bid of $37.50 per lineal foot was based upon the possibility of the river flooding and high water during the winter months and Skousen's estimate of approximately four months to complete the job. Based upon the fact that Vinnell's representative assured Skousen that it could commence work by August 1, 1966, and would have four months to complete the job, Skousen lowered its bid figure to $34.65 per lineal foot and entered into a subcontract agreement with Vinnell dated February 28, 1966. This agreement was silent as to a specific starting or termination date. As to this point, the subcontract provided:

> "Subcontractor shall commence work hereunder promptly upon receipt of notice from contractor to proceed; and shall at all times * * * complete its work and obligation hereunder at such times * * * as to conform to the progress charts and schedules established by contractor. * * *"

Following the execution of the subcontract and pursuant to a demand by Vinnell to post its bond under the subcontract, Skousen requested that Vinnell, in writing, specify a starting date for the subcontract. In reply to this request Vinnell indicated by letter dated March 15, 1966, that Skousen could begin work "approximately October 1, 1966." With this assurance, Skousen posted the required bond. Following numerous delays, Vinnell on December 30, 1966, gave Skousen notice that the project was in condition to begin the subcontract riprap work. The evidence is in conflict as to whether or not in fact the project was in condition to begin this work on that date, but in any event Skousen did not start on the job until January 23, 1967. By letter of January 30, 1967, Vinnell informed Skousen that the work was to be completed by March 10, 1967. This date was later extended to March 30, 1967, but this latter date was subsequently rescinded and the March 10 completion date reinstated. The testimony is in conflict as to whether Skousen was diligent in pursuing the work, once the job was started, or whether delays were occasioned by Vinnell's failures—charges and countercharges being exchanged by both groups. In any event, matters came to a head on February 28, 1967. On this date a representative of Vinnell visited the jobsite and informed Skousen that it had to complete the job by March 10, 1967. Skousen informed the representative that it would be impossible to complete the job by that time. Vinnell demanded that Skousen hire more men. This demand was refused. Vinnell, in essence, then advised Skousen that if it could not complete the job by the March 10 date, Vinnell would. When again Skousen insisted that it could not complete the job in the time allotted, Vinnell advised that it was taking over the job. At this point, representatives of both parties went to the project office where the Skousen representative was handed a telephone to speak to Vinnell's attorney. Vinnell's attorney advised Skousen that Vinnell was taking over the job and that the parties could do it "the hard way or the easy way." The "hard way" was explained to Skousen as going to Skousen's bonding company, "tying Skousen up" and instituting litigation. The "easy way" was for Skousen to sign a document dictated by Vinnell's attorney. This document, which was subsequently signed by both parties, provided:

> "Feb. 28, 1967
>
> "The undersigned sub-contractor having failed to increase progress hereby agrees that Vinnell Corporation shall take over all work in his subcontract on the Duncan-Alpine Highway.
>
> "The undersigned further agrees, because of prior notices, to waive forty-eight-hour written notice required by paragraph eleven of his subcontract.
>
> "It is agreed that the foregoing is under paragraph eleven of the subcontract.
>
> "/s/ Bob Skousen
>
> "Agreed to:
> Vinnell Corp.
> Clifton, Ariz.
>
> /s/ Donald L. Jellison, Vice President"

In addition, and at the same time this document was executed, the parties also entered into an agreement whereby Skousen agreed to rent to Vinnell certain Skousen equipment on the job for an agreed hourly rate.

Paragraph eleven of the subcontract referred to in the document dated February 28, 1967, provides:

"11. Termination of Contract:

If Subcontractor fails to prosecute the work required hereunder diligently, or to make the progress required by Owner or Contractor or fails in any way to perform the conditions hereof \* \* \* Contractor shall have the right, if it so elects \* \* \* by giving 48 hours' written notice of its election to Subcontractor to take over all work \* \* \* If the unpaid balance of the contract price hereof exceeds Contractor's expense of finishing the work, such excess shall be paid to the Subcontractor \* \* \*."

Upon signing the February 28 documents, Skousen immediately left the job and the subcontract was completed by Vinnell— completion occurring on March 30, 1967. Vinnell's accounting of expenses incurred in completing the subcontract did not exceed the subcontract price and a small amount was thus tendered to Skousen under paragraph 11 of the subcontract. This tender was refused and the instant litigation was commenced. Skousen's trial pleadings were based upon a breach of the subcontract by Vinnell's wrongful termination thereof and this was the only issue submitted to the jury.[2] No damages were sought in the trial court for Vinnell's delay in allowing Skousen to commence work.

Vinnell raises several questions on appeal, the principal one being: Skousen having signed an express agreement permitting Vinnell to take over the subcontract work, may Skousen maintain an action for wrongful termination of that contract?

This issue was presented to the trial court by a motion for summary judgment, a motion *in limine* and partial summary judgment; motion for directed verdict; motion for judgment notwithstanding the verdict; motion for new trial; and motion for a remittitur. All Vinnell's motions were denied.

It is important to note at this juncture that Skousen did not maintain at time of trial, nor does it strenuously maintain here, that the execution of the take-over agreement of February 28, 1967, was as the result of mistake, duress, fraud or coercion. Rather, Skousen contends that the take-over by Vinnell was a *fait accompli* at the time he was requested to execute the instrument and he was merely facilitating that already accomplished fact by attempting to minimize and mitigate the damages and complications arising from the wrongful take-over.

First, analyzing the February 28, 1967 document, it appears on its face that the parties agreed to three things:

1. It was agreed that Vinnell was to take over Skousen's subcontract because Skousen had failed to increase progress.

2. Skousen agreed to waive the 48-hour notice provision of paragraph 11 of the subcontract.

3. It was agreed that the take-over was to be pursuant to paragraph 11 of the subcontract.

Paragraph 11 of the subcontract, which the parties agreed was to be controlling, can only become applicable by its express terms, when there has been a default or failure on behalf of the subcontractor. In such event, this paragraph provides that

2. At the time of oral argument before this Court, Skousen's counsel advanced the argument that the verdict of the jury was sustainable under the theory that Vinnell's accounting in completion of the work under paragraph 11 of the subcontract was improper. This theory was neither pled, nor the jury instructed thereon, nor argued in the briefs before this Court. Under such circumstances, this Court will decline to consider such a theory. Milam v. Milam, 101 Ariz. 323, 419 P.2d 502 (1966); Payne v. Payne, 12 Ariz.App. 434, 471 P.2d 319 (1970).

the sole liability of the contractor is to account to the subcontractor for the difference between the cost of completion by the contractor and the contract price.

It is apparent to the Court, from the clear and unambiguous terms of the February 28, 1967 document and the referred to subcontract, that the parties on that date agreed to a termination of the subcontract because of a defalcation by the subcontractor and the subcontractor's sole remedy lay in enforcing the provisions of the termination paragraph. The parties had the right to enter into this type of mutual termination agreement. *See*: 17A C.J.S. Contracts § 386, (1963); Diamos v. Hirsch, 91 Ariz. 304, 372 P.2d 76 (1962).

May Skousen contend at trial that in fact the document executed on February 28, 1967, was not intended to mutually terminate the subcontract but was merely to mitigate damages? For two reasons, we think not.

First, the subjective intent of Skousen that he executed the document for purposes of mitigating damages cannot prevail over the objective expression of intent which may be fairly inferred from the writing itself. Secret intentions of the parties to a contract are wholly immaterial. It is not what the parties secretly intend, but it is what they manifest to each other by words that determines their rights. Fowler v. Security-First Nat. Bank, 146 Cal.App.2d 37, 303 P.2d 565 (1956).

Second, parol evidence of prior or contemporaneous agreement may not be used to add to, subtract from or vary and contradict the terms of a clear and unambiguous written contract. Richards Development Co. v. Sligh, 89 Ariz. 100, 358 P.2d 329 (1961).

May Skousen repudiate the February 28, 1967 document? Again, under the evidence presented and the theories argued, we think not. As previously indicated Skousen did not contend at time of trial that the written document of February 28, 1967, was the result of duress or coercion. Before this Court, Skousen does argue the coercive effect of the telephone call from Vinnell's attorney. However, a fair reading of this testimony reveals a threat by Vinnell to seek legal sanctions against Skousen. It is not duress, in a legal sense, which will vitiate a contract, to declare an intention to resort to the courts for legal sanctions for the purposes of insisting on what one believes are his legal rights. Dunbar v. Dunbar, 102 Ariz. 352, 429 P.2d 949 (1967). In the absence of any legal impediment to Skousen's contract of February 28, 1967, it may not be repudiated.

It appears to the Court that on February 28, 1967, Skousen, when confronted with the take-over by Vinnell of its subcontract, had two choices: One, leave the job and seek a legal determination of whether the take-over was wrongful, or, two, mutually agree to terminate the subcontract under paragraph 11 thereof and seek his redress, if any, under the provisions of that paragraph. On February 28, 1967, Skousen chose the latter course. Having made this decision, it must of necessity live with it.

For the foregoing reasons, the judgment of the trial court is reversed and the matter remanded with directions to enter judgment in favor of Vinnell.

HAIRE and EUBANK, JJ., concur.